**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**THE HISPANIC LEADERSHIP FUND, INC., and**
 **FREEDOM NEW YORK,**

                                  **Plaintiffs,**

          **vs.**                                                    **1:12-cv-1337**
                                                                     **(MAD/TWD)**

**JAMES A. WALSH, Co-chair of New York State**
**Board of Elections; DOUGLAS A. KELLNER,**
**Co-chair New York State Board of Elections;**
**EVELYN J. AQUILA, Commissioner of New York**
**State Board of Elections; GREGORY P.**
**PETERSON, Commissioner of New York State**
**Board of Elections,**

                                  **Defendants,**

          **and**

**NEW YORK STATE,**

                                  **Intervenor-Defendant.**
_____

**APPEARANCES:**                            **OF COUNSEL:**

**BRACEWELL & GIULIANI LAW, LLP**          **ANDREW RAFALAF , ESQ.**
1251 Avenue of the Americas                **LAURENCE LEVY, ESQ.**
49th Floor
New York, New York 10020
Attorneys for Plaintiffs

**HOLTZMAN, VOGEL & JOSEFIAK, PLLC**       **JASON B. TORCHINSKY, ESQ.**
45 North Hill Drive – Suite 100
Warrenton, Virginia 20186
Attorneys for Plaintiffs

**BROWN & WEINRAUB, PLLC**                 **JUSTIN E. DRISCOLL, ESQ.**
233 Broadway – Suite 2070
New York, New York 10279
Attorneys for Defendants Walsh and
Peterson

**PHILLIPS LYTLE, LLP**　　　　　　**KENNETH A. MANNING, ESQ.**
3400 HSBC Center　　　　　　　　**CRAIG R. BUCKI, ESQ.**
Buffalo, New York 14203-2887
Attorneys for Defendants Kellner and
Aquila

**OFFICE OF THE NEW YORK**　　　**KELLY L. MUNKWITZ, AAG**
**STATE ATTORNEY GENERAL**
The Capitol
Albany, New York 12224
Attorneys for Intervenor-Defendant
New York State

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

On August 28, 2012, Plaintiffs filed this action asking the Court to find several

provisions of the New York State Election Law unconstitutional facially and as applied.  *See*

Dkt. No. 1.  On the same day, Plaintiffs filed an emergency motion for a preliminary and

permanent injunction.  *See* Dkt. No. 4.

Currently before the Court is Plaintiffs' motion for preliminary and permanent injunctive

relief.

## II. BACKGROUND

**A.**　　　**Statutory and regulatory background**

To protect against corruption and the appearance of corruption, New York Election Law

limits contributions that an individual or corporation may make to candidates and political

parties.  *Schwartz v. Romnes*, 495 F.2d 844, 849 (2d Cir. 1974).  Moreover, to ensure that voters

have sufficient information to intelligently participate in elections, deter corruption, and enable

the New York State Board of Elections ("Board of Elections") to enforce contribution limits,

New York law requires certain organizations that seek to promote the election or defeat of a candidate or ballot issue to register and disclose ceratin information about themselves and those who contribute to them.

### 1. Contributions and independent expenditures

New York sets limits on the amounts that a corporation or individual may contribute to candidates, parties, and political committees.  A corporation doing business in New York may make contributions up to $5,000 in any year for purposes related to elections for New York state, local office, or party positions.  *See* N.Y. Elec. Law § 14-116(2).  An individual may make contributions, loans, or guarantees of funds of up to $150,000 in a year "in connection with the nomination or election of persons to state and local public offices and party positions within the state of New York in any one calendar year." *Id.* at § 14-114.  In an opinion issued by the New York State Board of Elections, this $150,000 limit applies to "contributions to independent committees[.]"  *See* Dkt. No. 4-7 at 3.

The Election Law defines a "contribution" as follows:

> (1) any gift, subscription, outstanding loan (to the extent provided for in section 14-114 of this chapter), advance, or deposit of money or any thing of value, made in connection with the nomination for election, or election, of any candidate, or made to promote the success or defeat of a political party or principle, or of any ballot proposal,

> (2) any funds received by a political committee from another political committee to the extent such funds do not constitute a transfer,

> (3) any payment, by any person other than a candidate or a political committee authorized by the candidate, made in connection with the nomination for election or election of any candidate, or any payment made to promote the success or defeat of a political party or principle, or of any ballot proposal including

> but not limited to compensation for the personal services of any
> individual which are rendered in connection with a candidate's
> election or nomination without charge; provided however, that
> none of the foregoing shall be deemed a contribution if it is made,
> taken or performed by a candidate or his spouse or by a person or a
> political committee independent of the candidate or his agents or
> authorized political committees.

N.Y. Elect. Law § 14-100(9).  Therefore, a payment of money to promote the success of defeat

or a candidate is not a "contribution" if the payment is "made, taken or performed . . . by a

person or a political committee independent of the candidate or his agents or authorized political

committees." *Id.*


### 2. Political committee registration and reporting requirements

In New York, a "political committee" is defined as "any corporation aiding or promoting

and any committee, political club or combination of one or more persons operating or

co-operating to aid or to promote the success or defeat of a political party or principle, or of any

ballot proposal; or to aid or take part in the election or defeat of a candidate for public office or

to aid or take part in the election or defeat of a candidate for nomination at a primary election or

convention, including all proceedings prior to such primary election, or of a candidate for any

party position voted for at a primary election, or to aid or defeat the nomination by petition of an

independent candidate for public office[.]" *Id.* § 14-100(1).  The term does not apply, however,

to "any committee or organization for the discussion or advancement of political questions or

principles without connection with any vote or to a national committee organized for the election

of presidential or vice-presidential candidates[.]" *Id.*

Under New York law, a "political committee" must designate a treasurer and a

depository, and the treasurer must keep" detailed, bound accounts of all receipts, transfers, loans,

liabilities, contributions and expenditures, made by the committee or any of its officers, members or agents acting under its authority or in its behalf." *Id.* § 14-118(1). Moreover, the political committee must register by filing a statement which provides, among other things, the name and address of the treasurer, the name of its depository institution (bank), and "the candidate or candidates or ballot proposal or proposals the success or defeat of which the committee is to aid or take part[.]" *Id.* Further, a political committee must file statements listing the names and addresses of contributors who donate ninety-nine (99) dollars or more to the committee and the amounts of such contributions. *See id.* § 14-102(1). A political committee is not required to register and file reports, however, if its aggregate expenditures do not exceed fifty (50) dollars during any calendar year. *See* 9 N.Y.C.R.R. § 6200.5.

### 3. Political Action Committees

Political Action Committees ("PACs") are designated by the Board of Elections as "committee type 2, and cannot make expenditures to aid or take part in the nomination, election or defeat of a candidate, other than in the form of contributions." *See* Dkt. No. 18-27 at ¶ 27 (citing Election Law §§ 14-112, 14-118(1)). According to Defendants, "[t]he reason why committees that only make contributions (PACs) are not required to list candidates being supported or opposed, is that there is no requirement that they comply with candidate limits, as PACs are not authorized committees." *See id.* at ¶ 28 (citing Election Law §§ 14-112, 14-114). Moreover, Defendants claim that PACS do not have to list candidates to be supported or opposed, or to disclose whether they are authorized by candidates or not, because contributions made by PACs are subject to the applicable limit of the recipient candidate or that candidate's

authorized committee, and must be disclosed both on the PAC's campaign finance report, as well as the corresponding recipient candidate/committee's report. *See id.* at ¶ 29.

Defendants assert that disclosure by the PAC making the contribution, as well as disclosure by the candidate receiving it, provide the Board of Elections with the information necessary to ascertain whether applicable limits have been exceeded. *See id.* (citing Election Law §§ 14-100(9), 14-102, 14-104, 14-112 & 14-114). Moreover, other types of political committees must disclose the candidates to be supported or opposed and whether they are authorized or not, as this allows the Board of Elections to determine whether contribution limits apply. *See id.* at ¶ 30. Defendants further contend that "PACs are different from corporations or unions which engage in express advocacy, as PACs are created for a specific purpose – only to make contributions. Express advocacy by corporations or unions, and information as to whether or not such activity was coordinated, authorized or unauthorized by the candidates to be supported or opposed, determine whether the group is a different type of political committee which would be subject to the Election Law and its limits." *See id.* at ¶ 32.

### 4. Authorized/Unauthorized Committees

An "authorized committee" is the term derived from the Election Law relating to those political committees which are specifically authorized by a candidate to "aid or take part in his election." N.Y. Elec. Law §§ 14-112, 14-100(9)(3) & 14-104(1)-(2). According to Defendants, "[a]n unauthorized committee is the term derived from the Election Law relating to, as the name implies, committees not authorized by a candidate to 'aid or take part in his election.' This committee is designated as a type 9 by the Board." *See* Dkt. No. 18-27 at ¶ 34.

Pursuant to the Election Law, "[a]ny political committee aiding or taking part in the election or nomination of any candidate, other than by making contributions, shall file, in the office in which the statements of such committee are to be filed pursuant to this article, either a sworn verified statement by the treasurer of such committee that the candidate has authorized the political committee to aid or take part in his election or that the candidate has not authorized the committee to aid or take part in his election." N.Y. Elec. Law § 14-112. This authorization statement, which is a single page, is referred to as a CF-03 "Committee Authorization Status" form. *See* Dkt. No. 18-27 at ¶ 35. This provision and the CF-03 form is intended to allow the Board of Elections and the public, including other candidates, to ascertain whether or not a contribution limit applies to that particular committee. *See id.* at ¶ 37.

On or about August 17, 2012, Plaintiff FNY filed its CF-03 with the Board of Elections. *See id.* at ¶ 36; *see also* Dkt. No. 18-30. When asked to list the candidate(s) "for whom your committee is aiding or taking part in their election or nomination (other than by making contributions) but who **have not authorized** your committee to do so," Plaintiff FNY answered "to be determined." *See id.*; *see also* Dkt. No. 18-30 (emphasis in original). Defendants claim that, according to the Election Law, "an unauthorized committee may make unlimited independent expenditures on behalf of candidates, and is not subject to candidate limits as applied to those expenditures." *See id.* at ¶ 38.

## B.    Plaintiffs' complaint and motion for injunctive relief

Plaintiff Hispanic Leadership Fund, Inc. ("HLF") is a tax-exempt organization primarily focused on issue advocacy. It is a non-partisan 501(c)(4) social welfare organization incorporated in Virginia. *See* Dkt. No. 4-9 at ¶ 3. Plaintiff HLF accomplishes its advocacy

mission through the use of television, radio, and print advertisements. *See id.* at ¶ 4. HLF also makes contributions to "like-minded organizations[,]" and will occasionally engage in political speech "expressly advocating for the election or defeat of a candidate." *See id.* at ¶¶ 5-6. HLF wishes to spend more than $5,000 on independent expenditures in New York this year, and wishes to make contributions in excess of $5,000 to New York political committees for the purpose of expressing its views through independent expenditures. *See id.* at ¶¶ 7-8.

Plaintiff Freedom New York ("FNY") "is an independent expenditure-only, Type 9, unauthorized committee registered with the New York State Board of Elections that promotes conservative approaches and principles to salient New York issues." *See* Dkt. No. 4 at ¶ 2.[1] FNY is seeking to solicit and accept corporate contributions in excess of $5,000 this year and contributions in excess of $150,000 from individual contributors – as well as donations from individual contributors who would exceed the $150,000 aggregate annual limit if they were to contribute to FNY – for the purpose of expressing its views through independent expenditures. *See id.* at ¶ 4.

The complaint alleges that New York's limits on contributions to independent expenditure-only political committees are unconstitutional. *See* Dkt. No. 1 at ¶¶ 55, 61. Plaintiffs also claim that New York's registration and reporting requirements for political committees are unconstitutionally vague, burdensome, and overbroad. *See id.* at ¶¶ 38-47, 70.

On or about August 1, 2012, counsel for Plaintiff FNY, Laurence A. Levy, spoke with a representative of the Board of Elections regarding contribution limits to "independent expenditure-only committees[.]" *See* Dkt. No. 4 at ¶ 6. The Board of Elections' representative

---

[1] According to the New York State Board of Elections website, Plaintiff FNY registered with the Board of Elections on August 17, 2012. *See* N.Y.S. Board of Elections, http://www.elections.ny.gov/CommitteesRegisteredbyDate.html (last visited October 2, 2012).

referred Mr. Levy to the Board of Elections' 1994 Opinion #3 (April 25, 1994) as the controlling authority. *See id.* In this opinion, the following question was presented: "Whether a person acting independent of the candidate or his agents or authorized political committees who gives money to an independent committee which is also acting independent of the candidate or his agents or authorized political committees is subject to the contribution limits of § 14-114 of the Election Law?" *See* Dkt. No. 4-7 at 2. The opinion concluded that "the intent of enacting this language was to allow for the unlimited expenditures or contributions by candidates to his or her own political campaign and the unlimited independent expenditures by persons or political committees." *See id.* The opinion further concludes that "while direct expenditures and contributions to his or her own candidate committee by a candidate and his or her spouse is unlimited, and direct expenditures by persons acting independently of the candidate and his or her committee are unlimited, contributions to independent committees are limited by the limits imposed under § 14-114 of the Election Law." *See id.* at 3. Mr. Levy was also informed that independent expenditures require registration as a Type 9, unauthorized committee. *See* Dkt. No. 4 at ¶ 6.

On or about August 20, 2012, Mr. Levy spoke with William McCann, Special Deputy Counsel for the Board of Elections. *See id.* at ¶ 7. Mr. McCann reiterated that the 1994 Opinion continues to be the official position of the Board of Elections regarding limitations on contributions to independent expenditure groups. *See id.* In light of his communications with the Board of Elections, Mr. Levy counseled Plaintiff FNY that it was currently prohibited from soliciting and accepting contributions for the purpose of expressing its views through independent expenditures in excess of New York statutory limits. *See id.* at ¶ 8.

In their complaint and motion for injunctive relief, Plaintiffs claim that they wish to meaningfully participate in the upcoming general election in New York, but that, absent injunctive relief, their ability to fully exercise their free speech rights will be restrained.  *See* Dkt. No. 4-11 at 6.  Specifically, Plaintiffs claim that New York Election Law restrains corporate entities from speaking after they have reached an annual $5,000 expenditure threshold in direct contravention of Supreme Court precedent.  *See id.* at 6-7 (citing N.Y. Elec. Law § 14-116(2)) (other citations omitted).  Next, Plaintiffs allege that New York impermissibly restrains political speech by limiting the contribution amounts an organization or individual can make to entities that only make independent expenditures.  *See id.* at 7 (citing N.Y. Elec. Law § 14-114(8)) (other citations omitted).  Plaintiffs argue that, pursuant to Supreme Court precedent, several federal courts have recently held that contributions to organizations that make only independent expenditures cannot be limited under either state or federal law.  *See id.* (citations omitted).  Further, Plaintiffs argue that New York has further restrained speech by making the acceptance and the giving of a contribution exceeding the maximum specified in Article 14 of the Election Law a misdemeanor – thereby threatening imprisonment for the exercise of First Amendment rights – and by making the acceptance of such contributions subject to civil penalties.  *See id.* (citing N.Y. Elec. Law § 14-126).

Next, Plaintiffs argue that New York ignores Supreme Court precedent when it defines a political committee as any organization that makes any expenditures, including independent expenditures, "connected to a vote" or in aid of a vote, and requires those political committees to register and disclose all of their contributors who contributed fifty (50) dollars or more.  *See id.* (citations omitted).  Plaintiffs claim that these requirements directly contravene *Buckley v. Valeo*, 424 U.S. 1 (1976), in which the Supreme Court, in an effort to protect organizations that only

10

occasionally engage in campaign-related spending, held that only organizations with the major purpose of engaging in campaign-related speech could be so regulated.  *See id.*

## III. DISCUSSION

**A.      Standard of review**

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consol. Edison Co.*, 409 F.3d 506, 510 (2d Cir. 2005) (citation omitted).  "A decision to grant or deny a preliminary injunction is committed to the discretion of the district court." *Polymer Tech. Corp. v. Mimran*, 37 F.3d 74, 78 (2d Cir. 1994) (citation omitted).

A party seeking a preliminary injunction must establish "'a threat of irreparable injury and either (1) a probability of success on the merits or (2) sufficiently serious questions going to the merits of the claims to make them a fair ground of litigation, and a balance of hardships tipping decidedly in favor of the moving party.'" *Allied Office Supplies, Inc. v. Lewandowski*, 261 F. Supp. 2d 107, 108 (D. Conn. 2005) (quoting *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003)).  "'When, as here, the moving party seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard.'" *Metro. Taxicab Bd. of Trade v. City of N.Y.*, 615 F.3d 152, 156 (2d Cir. 2010) (quotation omitted); *see also Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (quotation omitted).

Moreover, in certain circumstances, an even higher standard applies.  "The moving party must make a 'clear' or 'substantial' showing of a likelihood of success where (1) the injunction

sought 'will alter, rather than maintain, the status quo'- *i.e.*, is properly characterized as a 'mandatory' rather than 'prohibitory' injunction; or (2) the injunction sought 'will provide the movant with substantially all the relief sought, and that relief cannot be undone even if the defendant prevails at a trial on the merits.'" *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996) (quoting *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995).[2]

The Supreme Court has observed that the decision of whether to award preliminary injunctive relief is often based on "procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Consonant with this view, the Second Circuit has held that a district court may consider hearsay evidence when deciding whether to grant preliminary injunctive relief. *See Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010). Therefore, the strict standards for affidavits under the Federal Rules of Evidence and in support of summary judgment under Rule 56(c)(4) of the Federal Rules of Civil Procedure requiring that an affidavit be made on personal knowledge are not expressly applicable to affidavits in support of preliminary injunctions. *See Mullins v. City of New York*, 634 F. Supp. 2d 373, 384 (S.D.N.Y. 2009) (citations omitted). Nevertheless, courts have wide discretion to assess the affidavit's credibility and generally consider affidavits made on information and belief to be insufficient for a preliminary injunction. *See* 11A Charles Alan Wright et al., Federal Practice and Procedure § 2949 (2d ed. 1995); *Mullins*, 634 F. Supp. 2d at 373, 385, 390 n.115 (declining to fully credit the "defendants' hearsay affidavit" and noting that

---

[2] As the Second Circuit has noted, "'[t]he distinction between mandatory and prohibitory injunctions is not without ambiguities or critics,' . . . and that in a close case an injunction can be framed in mandatory or prohibitory terms[.]" *Jolly*, 76 F.3d at 473-74 (internal quotations and citation omitted).

while the court "may consider hearsay evidence in a preliminary injunction hearing . . . , a court may weigh evidence based on whether such evidence would be admissible under the Federal Rules of Evidence").

In the Second Circuit "there is no hard and fast rule . . . that oral testimony must be taken on a motion for a preliminary injunction or that the court can in no circumstances dispose of the motion on the papers before it." *Maryland Cas. Co. v. Realty Advisory Bd. of Labor Relations*, 107 F.3d 979, 984 (2d Cir. 1997) (quoting *Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 259 (2d Cir. 1989)). "Generally, the district court is not required to conduct an evidentiary hearing on a motion for a preliminary injunction when essential facts are not in dispute." *Id.*

Even if the plaintiff demonstrates irreparable harm and a likelihood of success on the merits, however, the remedy of preliminary injunctive relief may still be withheld if equity so requires. "An award of an injunction is not something a plaintiff is entitled to as a matter of right, but rather it is an equitable remedy issued by a trial court, within the broad bounds of its discretion, after it weighs the potential benefits and harm to be incurred by the parties from the granting or denying of such relief." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999) (citation omitted). In cases concerning a state's electoral process, courts must, as a matter of equity, consider whether the public interest favors the issuance of an injunction that threatens to interfere with or interrupt an ongoing election. *See Diaz v. Silver*, 932 F. Supp. 462, 466 (E.D.N.Y. 1996) (citation omitted); *see, e.g., McComish v. Brewer*, No. cv-08-1550, 2008 WL 4629337, *12 (D. Ariz. Oct. 17, 2008) (holding that, in challenge to state's campaign finance system during the "extraordinary context of an election in progress," preliminary injunctive relief

was not warranted because the harm to participating candidates and the public outweighed the plaintiffs' irreparable harm and likelihood of success on the merits).

**B.    *Citizens United v. Federal Election Comm'n*, 558 U.S. 310 (2010)**

Before launching into a claim-by-claim analysis, it is worthwhile to set forth the holdings and central reasoning in *Citizens United v. Federal Election Comm'n*.  *Citizens United* produced a two-fold ruling: "Government may regulate corporate political speech through identification and disclosure requirements, but it may not suppress that speech altogether." *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, ___, 130 S. Ct. 876, 886 (2010).

In *Citizens United*, the Supreme Court made clear that there is no state interest sufficient to justify a law that entirely prohibits corporate and union independent political expenditures.  It reasoned that the only valid governmental interest in regulating campaign expenditures is preventing the reality or appearance of *quid-pro-quo* corruption, and independent expenditures, precisely because they are uncoordinated with candidates, pose no such threat.  *See id.* at 908-09.  This view on campaign spending is at least as old as *Buckley v. Valeo*, in which the Supreme Court remarked that "[u]nlike contributions, such independent expenditures may well provide little assistance to the candidate's campaign and indeed may prove counterproductive." *Buckley v. Valeo*, 424 U.S. 1, 47 (1976).

*Citizens United* also held that the "First Amendment does not permit Congress to make these categorical distinctions based on the corporate identity of the speaker and the content of the political speech." *Citizens United*, 130 S. Ct. at 913.  The Court accordingly struck down 2 U.S.C. § 441b's total ban on corporate and union spending from general treasury funds for express advocacy or electioneering communications – forms of regulated independent

14

expenditures.  *See id.*[3]  *Citizens United* overruled *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990), and, in part, *McConnell v. Federal Election Comm'n*, 540 U.S. 93, 203-09 (2003), which had permitted limits on such speech.

In reaching that result, *Citizens United* dispatched the counter-argument that the law's provision allowing a corporation that wished to engage in such speech to form a PAC was a suitable alternative to direct corporate or union speech. *See Citizens United*, 130 S. Ct. at 897. Previously, a corporation like the plaintiff in *Citizens United* could only engage in express advocacy or electioneering speech indirectly by creating a PAC, to which only its stockholders or employees could contribute.  *See id.* at 887-88.  The Court found the PAC approach did not alleviate the electioneering ban's speech-repressive effects, because such PACs did not allow the corporation or union to speak for itself and were subject to extensive registration, reporting, and disclosure requirements.  *See id.* at 897-98.  Thus, federal PACs were "burdensome alternatives," and posed "onerous restrictions" that could hinder corporate and union speech during a campaign.  *See id.*  That critique reflected a longstanding skepticism of a federally-defined PACs' ability to substitute for pure political speech.  *See Fed. Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 477 n.9 (2007); *Mass. Citizens for Life, Inc.*, 479 U.S. at 253-56.

---

[3] Express advocacy refers to communications that direct the viewer in the manner of words like "'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.'"  *Buckley*, 424 U.S. at 44 n.52; *see also Fed. Election Comm'n v. Mass. Citizens for Life, Inc. ( MCFL)*, 479 U.S. 238, 249-50 (1986).  Under federal law, an electioneering communication is "any broadcast, cable, or satellite communication" that "refers to a clearly identified candidate for Federal office" and that is made within sixty days before a general election and thirty days before a primary election.  2 U.S.C. § 434(f)(3)(A)(i).

At the same time, eight justices joined the portion of the *Citizens United* opinion upholding the identification and disclosure requirements that also applied to the plaintiff. *See Citizens United*, 130 S. Ct. at 886, 913-16. This part of the opinion affirmed another longstanding view: in spite of the burdens they pose to political speech, "disclosure requirements certainly in most applications appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption that Congress found to exist." *Buckley*, 424 U.S. at 68. Since *Buckley*, the Supreme Court has recognized that different legitimate government interests support disclosure requirements, as opposed to those interests which support limits on spending in campaigns. These interests include (1) informing voters as to the "sources of a candidate's financial support," enabling voters to better "evaluat[e] those who seek office"; (2) limiting corruption and its appearance by making large contributions and expenditures transparent; and (3) gathering data to discover any violations of the campaign finance laws. *Id.* at 66-68.

The Supreme Court relied on the first rationale to justify the provisions applied to the plaintiff in *Citizens United*. *See Citizens United*, 130 S. Ct. at 914-16. To gauge their constitutionality, it applied *Buckley*'s "'exacting scrutiny'" test, which requires a "'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." *Id.* at 914 (citing *Buckley*, 424 U.S. at 64, 66); *see also John Doe No. 1 v. Reed*, ___U.S. ___, 130 S. Ct. 2811, 2818 (2010) (confirming that exacting scrutiny applies to disclosure requirements). The provisions survived this scrutiny. *See id.* at 915-16.

In reaching its conclusion, the Court in *Citizens United* explicitly rejected the argument that disclosure could only cover express advocacy or its functional equivalent. *See id.* at 915. This statement assured the vitality of the part of *McConnell* in which the Court "rejected the notion that the First Amendment requires Congress to treat so-called issue advocacy differently

16

from express advocacy." *McConnell*, 540 U.S. at 194; *see also Citizens United*, 130 S. Ct. at

915.  The *Citizens United* Court made clear that the power to require disclosure extends beyond

the power to limit speech, analogizing that although Congress "has no power to ban lobbying

itself," it may require registration and disclosure of lobbyists.  *See Citizens United*, 130 S. Ct. at

915 (citing *United States v. Harris*, 347 U.S. 612, 625, 74 S. Ct. 808, 98 L. Ed. 989 (1954)).

Indeed, *Citizens United* went further toward solidifying this principle, explicitly endorsing a

system of relatively unrestricted political speech paired with "effective disclosure," noting that

many of Congress' findings of influence-peddling in promulgating campaign finance legislation

"were premised on a system without adequate disclosure."  *Id.* at 916.


**C.      Campaign finance laws and applicable levels of scrutiny**

The United States Supreme Court has held that campaign contribution and expenditure

limitations "operate in an area of the most fundamental First Amendment activities."  *Buckley*,

424 U.S. at 15.  "A restriction on the amount of money a person or group can spend on political

communication during a campaign necessarily reduces the quantity of expression by restricting

the number of issues discussed, the depth of their exploration, and the size of the audience

reached."  *Id.* at 19 (footnote omitted).  "This is because virtually every means of communicating

ideas in today's mass society requires the expenditure of money."  *Id.*

The Supreme Court has drawn a distinct line between limits on contributions and limits

on independent expenditures.  Contribution limits are "only a marginal restriction upon the

contributor's ability to engage in free communication."  *Id.* at 20.  "A contribution serves as a

general expression of support for the candidate and his views, but does not communicate the

underlying basis for the support."  *Id.* at 21.  "The quantity of communication by the contributor

does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing." *Id.* By contrast, expenditure limits impose "significantly more severe restrictions on protected freedoms of political expression and association." *Id.* at 23. Unlike large campaign contributions, expenditures do "not presently appear to pose dangers of real or apparent corruption." *Id.* at 46; *see also Citizens United*, 130 S. Ct. at 909 (concluding that "independent expenditures . . . do not give rise to corruption or the appearance of corruption"). "The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate." *Buckley*, 424 U.S. at 47.

As such, expenditure limitations are subject to strict scrutiny – they must "satisfy the exacting scrutiny applicable to limitations on core First Amendment rights of political expression." *Id.* at 44-45. The Supreme Court has repeatedly adhered to *Buckley*'s constraints on expenditure limits. *See Randall v. Sorrell*, 548 U.S. 230, 236 (2006) (citing cases). Contribution limitations, on the other hand, are subject to a less rigorous standard of review – they must be "closely drawn" to match a "sufficiently important interest." *Buckley*, 424 U.S. at 25.[4] In light of this less rigorous standard applicable to contribution limits, the Supreme Court has routinely upheld contribution limits. *See Randall*, 548 U.S. at 247 (citing cases).

So far, the only constitutionally sufficient justification for campaign finance laws that the Court has recognized is limiting "the actuality and appearance of corruption resulting from large individual financial contributions." *Buckley*, 424 U.S. at 25-26; *see also Davis v. Fed. Election*

---

[4] "Contributions" include expenditures coordinated with a candidate or party, which serves to prevent attempts to circumvent limits placed on contributions. *See Fed. Election Comm'n v. Colo. Republican Fed. Campaign Committee*, 533 U.S. 431, 443 (2001) (citations omitted).

*Comm'n*, 554 U.S. 724 (2008).  The Court in *Buckley* was concerned with the danger of "large contributions . . . given to secure a political quid pro quo from current and potential office holders."  *Buckley*, 424 U.S. at 26-27.  The Court acknowledged that "restrictions on direct contributions are preventative, because few if any contributions to candidates will involve *quid pro quo* arrangements."  *Citizens United*, 130 S. Ct. at 908 (citing *Fed. Election Comm'n v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 260, 107 S. Ct. 616, 93 L. Ed. 2d 539 (1986)) (other citations omitted).  The Court has also recognized that the government has a valid anticorruption interest in preventing circumvention of contribution limits.  *See Fed. Election Comm'n v. Colorado Republican Fed. Campaign Comm.*, 533 U.S. 431, 456 (2001) (*Colorado II* ) ("[A]ll Members of the Court agree that circumvention is a valid theory of corruption").


**D.    Likelihood of success on the merits**

As discussed above, a corporation doing business in New York may make contributions up to $5,000 in any year for purposes related to elections for New York State, local office, or party positions.  *See* N.Y. Elec. Law § 14-116(2).  An individual may make contributions (or loans or guarantees of funds) of up to $150,000 in a year "in connection with the nomination or election of persons to state and local public offices and party positions," with exceptions for contributions to family members.  *See id.* § 14-114(8).  A discussed above, a formal opinion issued by the Board of Elections states that the provision limits an individual's contributions to a political committee to $150,000, unless the individual is contributing to his own political committee or a family member's political committee.  *See* N.Y.S. Board of Elections, Formal Op. No. 3 (Apr. 25, 1994) (Dkt. No. 4-7).

The Election Law defines "contribution" as follows: (1) a donation from an individual "made in connection with the nomination for election, or election, of any candidate, or made to promote the success or defeat of a political party or principle, or of any ballot proposal," (2) a donation of funds from one political committee to another political committee," and (3) "any payment, by any person other than a candidate or a political committee authorized by the candidate, made in connection with the nomination for election or election of any candidate, or any payment made to promote the success or defeat of a political party or principle, or of any ballot proposal[.]"  N.Y. Elec. Law § 14-100(9)(1-3).  A payment of money to promote the success or defeat of a candidate is not a "contribution" if the payment "is made, taken or performed . . . by a person or a political committee independent of the candidate or his agents or authorized political committees."  *Id.*[5]

Plaintiffs argue that several federal courts of appeal and district courts have found that, since there is no sufficiently compelling state interest in limiting the amount of independent expenditures, there can likewise be no compelling interest in limiting the amount one can give to a group or an individual making only independent expenditures.  *See* Dkt. No. 4-11 at 13-14 (citations omitted).  Plaintiff HLF claims that it is "a tax-exempt organization primarily focused

---

[5] In Defendant New York State's opposition to Plaintiffs' motion for a preliminary injunction, the State claims that the text of section 14-116(2) provides that the $5,000 limitation applies to "'expenditures, including contributions,' made by corporations.  Nonetheless, the Board of Elections does not interpret the provision to establish any limit on corporate expenditures that are not deemed 'contributions' to a candidate, political party, or political committee, but rather are independently made to fund political speech by the corporation itself. . . . (Defs. Opp. Br.) at 8 n.3 (rejecting plaintiffs' assertion that New York law imposes ceiling on corporate independent expenditures), 14 n.7 (noting Board's proposed regulations governing disclosure of independent expenditures)."  *See* Dkt. No. 27 at 8-9 n.2.  As such, Defendant New York State contends that, "[p]erhaps in light of this interpretation, the complaint does not seek any relief from this Court with respect to any purported statutory limit on independent expenditures, . . . and plaintiffs appear to concede this point in their reply brief."  *See id.* (citing Pls. Reply Br. at 8).

on issue advocacy," and that its First Amendment rights are being violated by New York's

$5,000 expenditure threshold and the requirement that it "function as a political committee." *See

id.* at 7-8.  Moreover, Plaintiff HLF argues that it wishes to make unlimited contributions to

organizations, such as Plaintiff FNY, "that only make independent expenditures for the General

Election." *See id.*  Plaintiff FNY claims that it wishes to solicit and receive unlimited

contributions from corporations and individuals for the purpose of making independent

expenditures in the General Election, but that New York's Election Law currently prevents it

from doing so in violation of the First Amendment.  *See id.*

Plaintiffs also argue that New York is violating Plaintiff HLF's constitutional rights by

requiring it to register as a political committee, even if it only makes one contribution.  *See id.* at

18-27.  Plaintiffs claim that New York Election Law § 14-100(1) violates the "major purpose"

test set forth in *Buckley* and that it contains no mechanism to prevent it from being overbroad.

*See id.* at 22-27.  Finally, Plaintiffs argue that section 14-100(1) "is vague in that it is not clear

what activity triggers registration and reporting."  *See id.* at 26.

Having carefully reviewed the arguments of counsel, the Court finds that, while Plaintiffs

have set forth substantial arguments in favor of their underlying complaint, they have not

established by the requisite evidence either that they in fact have a likelihood of prevailing on

the merits or, as discussed in more detail below, that the harm that would follow if the injunction

were not granted would be anything other than *de minimis.  See Conservative Party of N.Y. v.

N.Y. Board of Elections*, No. 10 Civ 6923, 2010 WL 4455867, *2 (S.D.N.Y. Oct. 15, 2010).

Although Plaintiff HLF claims that its "major purpose" is making independent expenditures, and

Plaintiff FNY claims that it seeks this relief to make "only" independent expenditures, the Court

declines to accept these conclusory assertions without any factual record establishing their

veracity. *See Vermont Right to Life Comm., Inc.*, ___ F. Supp. 2d ___, 2012 WL 2370445, at

*25 (declining "to accept FIPE as an independent-expenditure-only PAC without resort to the

factual record").

   Moreover, the Court has serious doubts as to the validity of Plaintiffs' as-applied

challenge to New York's registration and reporting requirements for political committees, and

the breadth of the statute's definition regarding what constitutes a "political committee."  Plaintiff

HLF claims that they intend only to make "isolated and occasional independent expenditures" in

New York, and, therefore, New York's requirements are unconstitutionally burdensome on them

if they are forced to register as a political committee. *See* Dkt. No. 1 at ¶¶ 16, 20, 72-76.

Plaintiffs then proceed to argue, however, that Plaintiff HLF "is seeking to spend more than

$5,000 on independent expenditures in New York this year, and make contributions in excess of

$5,000 this year to FNY **and** similar New York political committees for the purpose of

expressing its views[.]"  *See* Dkt. No. 4-11 at 8 (emphasis added).  These contradictory

statements belie Plaintiffs' claim that Plaintiff HLF should be precluded from registering as a

political committee because it only seeks to make "isolated and occasional" independent

expenditures.

   Further, as discussed in greater detail below, a balance of the equities favors denying the

requested preliminary injunctive relief in light of, among other things, Plaintiffs' delay in

bringing this action, the regulatory challenges the State would face in light of the pending

November 6, 2012 election, and because Defendants would not be able to seek meaningful

appellate review of any preliminary injunctive relief because of the last minute filing of this

action. *See Conservative Party of N.Y.*, 2010 WL 4455867, *2 (holding that "the Court need not

reach the merits at this time because it agrees with defendants that plaintiffs have slept on their

rights and cannot at this late date seek the kind of onerous and potentially confusing relief

envisioned . . . , absent a showing greater than any they would be able to present even with the

benefit of an evidentiary hearing").

### E.    Irreparable harm and unjustified delay in bringing this action

Intervenor-Defendant New York State asserts that Plaintiffs unjustifiably delayed in

bringing this action, thereby requiring the Court to deny their motion for preliminary injunctive

relief. *See* Dkt. No. 27 at 11. Defendant New York argues that the relief Plaintiffs seek is

directly related to the Supreme Court's January 2010 *Citizens United* decision. *See id.* As such,

Defendant New York claims that "Plaintiffs could have brought this lawsuit at any time in the

last two-plus years or more, as neither New York's Election Law nor federal law changed during

that period in any respect that is material to their claims." *See id.*

In *Respect Maine PAC v. McKee*, 622 F.3d 13 (1st Cir. 2010), the plaintiffs brought suit

on August 5, 2010, challenging several provisions of Maine's election law that set independent

expenditure reporting requirements, limited contributions to candidates for governor to $750 per

election, and provided, under some conditions, matching public funds for participating Maine

Clean Election Act ("MCEA") candidates. *See Respect Maine PAC v. McKee*, 622 F.3d 13, 14

(1st Cir. 2010). The district court denied the plaintiffs' motion for a preliminary injunction on

September 17, 2010, and the plaintiffs appealed. *See id.* Agreeing with the district court, the

First Circuit first noted that the plaintiff Respect Maine PAC failed to show immediate injury

since "it has not produced evidence that it spent any sums nor has it alleged specific plans to

make expenditures likely to trigger matching funds." *Id.* at 16. Thereafter, in balancing the

harms and the public interest, the court held as follows:

> Under the balancing test, we consider the considerable harm that
> an emergency injunction would cause the many candidates, both
> MCEA participants and not, who have relied on the challenged
> provisions.  We also note the harm to the public interest from the
> chaos that will ensue if the Maine election laws, which have been
> in place since 1996, are invalidated by a court order in the crucial
> weeks before an election.

> \* \* \* \* \*

> In determining the weight to be accorded to the appellants' claims,
> we also note that this "emergency" is largely one of their own
> making.  The appellants, well aware of the requirements of the
> election laws, chose not to bring this suit until August 5, 2010,
> shortly before the November 2 elections.  Appellant Cushing, an
> incumbent running for reelection, declared his candidacy before
> March 15, 2010.  Appellants did not file their case until at least six
> months after roughly 280 candidates had declared their intention to
> rely on MCEA public funding, and two months after the primary
> election.  Further, the case law on which they rely is not new.
> They rely primarily on *Davis v. Fed. Election Comm'n*, 554 U.S.
> 724, 128 S. Ct. 2759, 171 L. Ed. 2d 737 (2008), which was
> decided on June 26, 2008.  *Citizens United v. Fed. Election
> Comm'n*, ___ U.S. ___, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010),
> was decided in January 2010.

*Id.* at 16 (footnote omitted).  As such, the court found that, given the potential harm to Maine and

the candidates if the preliminary injunction was granted, and the public interest in maintaining

the status quo during the period of the court's deliberations on these complex matters, the district

court properly denied the motion for a preliminary injunction.  *See id.*

Similarly, in *Worley v. Roberts*, the plaintiffs brought a challenge to Florida's campaign

financing statutes on September 28, 2010, with the general election to be held on November 2,

2010.  *See Worley v. Roberts*, 749 F. Supp. 2d 1321, 1323-24 (N.D. Fla. 2010).  In denying the

plaintiffs' motion for a preliminary injunction as to Florida's law requiring the disclosure of

contributors, the court found that

> there have been no changes in the relevant facts or law that explain
> the last-minute filing of the lawsuit.  This is, instead, an emergency

> entirely of the plaintiffs' own making. And the disruption that
> would be caused by the invalidation of this disclosure requirement,
> on the eve of the election, would be substantial. If the plaintiffs
> were likely to prevail on the merits, the late filing of the claim
> would perhaps not be fatal. But when a claim seeks to depart from
> long-established precedent, and does so too late to allow
> meaningful appellate review, the balance of equities and public
> interest at least suggest caution.

*Id.* at 1325.

Finally, in *Conservative Party of N.Y. v. N.Y.S. Board of Elections*, the plaintiffs, two

minor political parties, filed suit on September 14, 2010 challenging the Election Law's policy

regarding so-called "double-votes." *Conservative Party of N.Y. v. N.Y.S. Board of Elections*, No.

10 Civ. 6923, 2010 WL 4455867, *1 (S.D.N.Y. Oct. 15, 2010). A "double vote" is cast when a

candidate accepts the nomination of more than one political party and the voter improperly votes

for that candidate on multiple party lines. *See id.* In such a situation, the vote is counted towards

the first party on the ballot, which is invariably one of the major parties. *See id.* The plaintiffs,

as minor parties hoping to garner as many votes as possible, alleged that this practice violated

their First and Fourteenth Amendment rights. *See id.*

Denying the plaintiffs' request for preliminary injunctive relief, the court found that the

plaintiffs had "slept on their rights and cannot at this late date seek the kind of onerous and

potentially confusing relief envisioned by even their more restricted proposal, absent a showing

greater than any they would be able to present even with the benefit of an evidentiary hearing."

*Id.* at *2. Further, the court found that there was no good reason, considering the plaintiffs'

knowledge about this practice for a considerable amount of time, for the plaintiffs' to have

brought such a request so close to the election. *See id.* As such, the court held that,

> [u]nder these circumstances, and taking into account the
> speculative nature of the harm that plaintiffs claim they could
> prove at an evidentiary hearing, the obvious potential for confusion

25

> created by a change that would have to be made on such short
> notice and without adequate training of personnel, and the simple
> fact that plaintiffs waited until six weeks before the election to file
> their complaint, the Court will not invoke the extraordinary
> remedy of a preliminary injunction at this time.

*Id.* (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L. Ed. 2d 162 (1997));

*see also Foley v. State Elections Enforcement Commission*, No. 3:10cv1091, 2010 WL 2836722,

*4 (D. Conn. July 16, 2010) (holding that the existence and nature of an injury is only one factor

to consider when determining whether the harm is irreparable; another factor is the parties' delay

in commencing their suit.  "'A long delay by plaintiff after learning fo the threatened harm may

be taken as an indication that the harm would not be serious enough to justify a preliminary

injunction'" (quotation and other citation omitted)).

　　　As in the cases discussed above, Plaintiffs have failed to establish that they will suffer

irreparable harm absent preliminary injunctive relief.  Plaintiffs have not provided any evidence,

other than conclusory statements, that they have received any contributions, made any

expenditures, or that they have individuals ready to make such contributions that would trigger

the challenged provisions.  Plaintiffs claim irreparable and imminent injury from the possibility

of an enforcement proceeding against them, but they provide only a hypothetical sequence of

events that is far too speculative to warrant preliminary injunctive relief.

　　　Plaintiffs argue that this action was timely brought because it was filed "barely four

weeks after the Supreme Court's mandate was issued in *American Trade P'ship v. Bullock*, and

just eight weeks after that decision was issued."  *See* Dkt. No. 28 at 6.  This argument is entirely

unpersuasive.  In *American Tradition Piship, Inc.*, the Supreme Court held, in a one-paragraph

decision, that there can be "no serious doubt" that *Citizens United* applies to a Montana law

which provided that "'corporation may not make . . . an expenditure in connection with a

candidate or a political committee that supports or opposes a candidate or a political party.'" *Am. Tradition P'ship*, 132 S. Ct. 2490, 2491 (2012) (quotation omitted). Justice Ginsburg, in a statement attached to the order staying the decision of the Montana Supreme Court, concluded that the decision was squarely at odds with *Citizens United*. *See Vermont Right to Life Comm.*, 2012 WL 2370445, at *24 (quotation omitted). Similarly, even before the Supreme Court issued its decision in *Am. Trade P'ship*, the federal courts to have addressed the issue, applying *Citizens United* to both state and federal laws, all found that "because independent expenditures cannot corrupt, governments have no valid anti-corruption interest in limiting contributions to independent-expenditure-only groups." *Vermont Right to Life Comm.*, 2012 WL 2370445, at *23 (citations omitted); *see also SpeechNow.org v. Fed. Elec. Comm'n*, 599 F.3d 686, 694-95 (D.C. Cir. 2010); *Wis. Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 154 (7th Cir. 2011); *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1118-21 (9th Cir. 2011); *N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 295 (4th Cir. 2008) (holding same pre-*Citizens United*). Based on the foregoing, Plaintiffs' argument regarding the availability of this argument prior to the Supreme Court's decision in *Am. Trade P'ship* is without merit.

As the court in *Foley v. State Elections Enforcement Comm'n* held, although denying an injunction now may deprive Plaintiffs a remedy for the upcoming November 6, 2012 election, Plaintiffs' decision to wait until just two months before the election to challenge provisions of the Election Law that have been in place for decades undermines the alleged seriousness of the harm that they purportedly stand to suffer. *See Foley*, 2010 WL 2836722, at *5. Based on the foregoing, the Court finds that Plaintiffs have failed to establish that they will suffer irreparable harm absent an injunction or that they were justified in waiting to file this action so close to the pending election.

**F.      Balance of equities**

According to Defendants, if Plaintiffs are granted preliminary injunctive relief, "the

uniform application of contribution limits would be undermined or destroyed." *See* Dkt. No. 18-

27 at ¶ 47.  Moreover, Defendants claim that

> [t]he current system of campaign finance, including applicable
> limits and the disclosure of financial activity, is well established
> and long standing.  It provides stability to the Board, the public,
> candidates, and political committees who are familiar with these
> long standing established legal requirements, practices and
> customs.  Additionally, the Board could not satisfy its disclosure
> and educational responsibilities to the electorate, candidates,
> political committees, parties, and political organizations if
> injunctive relief were granted at this late date, less than two
> months before the election on November 6, 2012.

*See id.* at ¶ 48.

The Court agrees with Defendants.  As discussed above, Plaintiffs waited until the

eleventh hour to file this lawsuit and have not demonstrated sufficient cause for their delay.  This

delay, which essentially precludes meaningful appellate review, greatly supports Defendants

position that the balance of equities and public interest favor denying Plaintiffs' motion for

preliminary injunctive relief.  *See Justice v. Hosemann*, 829 F. Supp. 2d 504, 520-21 (N.D. Miss.

2011) (quotation omitted).  Finally, Plaintiffs' conclusory allegations regarding their actual and

intended activities, the fact that Defendants would need to make substantial changes to the

implementation of New York's Election Law, and the fact that there is insufficient time for the

Board of Elections to inform the public and candidates regarding any such changes to the law, all

weigh in favor of the Court's decision to deny Plaintiffs' motion for preliminary injunctive relief.

It is clear that the balance of equities favors denying the preliminary injunction because it

would disrupt the justifiable expectations of the individuals and entities that have and continue to

comply with the challenged provisions of the Election Law.  *See Foley*, 2010 WL 2836722, at *6

(citation omitted); *see also Lair v. Bullock*, ___ F.3d ___, 2012 WL 4883247, *13-*14 (9th Cir.

Oct. 16, 2012) (granting a stay of the district court's permanent injunction against the state of

Montana's campaign contribution limits statute because, "given the imminent nature of the

election, we find it important not to disturb long-established expectations that might have

unintended consequences[,]" and because, "once the election is over, it cannot be reversed, and

any consequences flowing from the disruption in equilibrium in the campaign contribution laws

would . . . be irreversible" (citation omitted)).  As such, the Court denies Plaintiffs' motion for

preliminary injunctive relief.


**IV. CONCLUSION**

After carefully reviewing the entire record in this matter, the parties' submissions and the

applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiffs' motion for a preliminary injunction is **DENIED**; and the Court

further

**ORDERS** that Plaintiffs' request to consolidate pursuant to Rule 65(a)(2) of the Federal

Rules of Civil Procedure is **DENIED**; and the Court further

**ORDERS** that Plaintiffs' letter motion requesting oral argument on its motion for a

preliminary injunction (Dkt. No. 31) is **DENIED** as moot; and the Court further

**ORDERS** that all further non-dispositive pre-trial matters are referred to Magistrate

Judge Dancks; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision

and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: October 23, 2012
        Albany, New York

Mae A. D'Agostino
U.S. District Judge