**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**THE HISPANIC LEADERSHIP FUND, INC., and**
 **FREEDOM NEW YORK,**

                    **Plaintiffs,**

    **vs.**                              **1:12-cv-1337**
                                          **(MAD/TWD)**

**JAMES A. WALSH, Co-chair of New York State**
**Board of Elections; DOUGLAS A. KELLNER,**
**Co-chair New York State Board of Elections;**
**EVELYN J. AQUILA, Commissioner of New York**
**State Board of Elections; GREGORY P.**
**PETERSON, Commissioner of New York State**
**Board of Elections,**

                    **Defendants,**

      **and**

**NEW YORK STATE,**

                    **Intervenor-Defendant.**
_____

**APPEARANCES:**                    **OF COUNSEL:**

**HOLTZMAN, VOGEL & JOSEFIAK, PLLC**    **JASON B. TORCHINSKY, ESQ.**
45 North Hill Drive – Suite 100
Warrenton, Virginia 20186
Attorneys for The Hispanic Leadership
Fund, Inc.

**POLITICAL LAW GROUP**            **DOUGLAS CHALMERS, ESQ.**
**a CHALMERS LLC**
5805 State Bridge Road #G77
Johns Creek, Georgia 30097
Attorneys for Freedom New York

**JAMES E. WALSH LAW FIRM**        **JAMES E. WALSH, ESQ.**
20 Church Avenue
Ballston Spa, New York 12020
Attorneys for Freedom New York

**BRACEWELL & GIULIANI, LLP**
1251 Avenue of the Americas
49th Floor
New York, New York 10020
Attorneys for Freedom New York

**LAURENCE LEVY, ESQ.**

**BROWN & WEINRAUB, PLLC**
50 State Street
4th Floor
Albany, New York 12207
Attorneys for Defendants Walsh and
Peterson

**PATRICK E. BROWN, ESQ.**

**PHILLIPS LYTLE, LLP**
3400 HSBC Center
Buffalo, New York 14203-2887
Attorneys for Defendants Kellner and
Aquila

**KENNETH A. MANNING, ESQ.**
**CRAIG R. BUCKI, ESQ.**

**OFFICE OF THE NEW YORK**
**STATE ATTORNEY GENERAL**
The Capitol
Albany, New York 12224
Attorneys for Intervenor-Defendant
New York State

**KELLY L. MUNKWITZ, AAG**
**JAMES SEAMAN, AAG**
**JOSHUA PEPPER, AAG**
**CATHY Y. SHEEHAN, AAG**

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM AND DECISION

## I. INTRODUCTION

On August 28, 2012, Plaintiffs filed this action asking the Court to find several

provisions of the New York State Election Law unconstitutional facially and as applied. *See*

Dkt. No. 1. On the same day, Plaintiffs filed an emergency motion for a preliminary and

permanent injunction. *See* Dkt. No. 4. On October 23, 2012, the Court denied Plaintiffs' motion

for a preliminary injunction. *See* Dkt. No. 32. On September 26, 2013, the Court denied

Defendants' motions to dismiss and for expedited discovery. *See* Dkt. No. 78. On October 18,

2013, Plaintiffs' moved for summary judgment, which Defendants have opposed. *See* Dkt. No. 89.

In light of the upcoming November elections, in a July 2, 2014 Order, the Court summarily granted Plaintiffs' motion for summary judgment, enjoined Defendants from enforcing the relevant provisions of the New York State Election Law, and indicated that an opinion articulating the rationale for its decision would follow. In accordance with the July 2, 2014 Order, the Court now issues the following Memorandum and Decision explaining its reasons for granting Plaintiffs' motion.

## II. BACKGROUND

### A. Statutory and regulatory background

To protect against corruption and the appearance of corruption, New York Election Law limits contributions that an individual or corporation may make to candidates and political parties. *Schwartz v. Romnes*, 495 F.2d 844, 849 (2d Cir. 1974). Moreover, to ensure that voters have sufficient information to intelligently participate in elections, to deter corruption, and to enable the New York State Board of Elections ("Board of Elections") to enforce contribution limits, New York law requires certain organizations that seek to promote the election or defeat of a candidate or ballot issue to register and disclose certain information about themselves and those who contribute to them.

### 1. Contributions and independent expenditures

New York sets limits on the amount that corporations and individuals may contribute to

candidates, parties, and political committees. A corporation doing business in New York may make contributions of up to $5,000 in any year for purposes related to elections for New York State office, local office, or party positions. *See* N.Y. Elec. Law § 14-116(2). An individual may make contributions, loans, or guarantees of funds of up to $150,000 per year "in connection with the nomination or election of persons to state and local public offices and party positions within the State of New York in any one calendar year." *Id.* at § 14-114. In an opinion issued by the New York State Board of Elections, this $150,000 limit applies to "contributions to independent committees[.]" *See* Dkt. No. 4-7 at 3.

The Election Law defines a "contribution" as follows:

> (1) any gift, subscription, outstanding loan (to the extent provided for in section 14-114 of this chapter), advance, or deposit of money or any thing of value, made in connection with the nomination for election, or election, of any candidate, or made to promote the success or defeat of a political party or principle, or of any ballot proposal,

> (2) any funds received by a political committee from another political committee to the extent such funds do not constitute a transfer,

> (3) any payment, by any person other than a candidate or a political committee authorized by the candidate, made in connection with the nomination for election or election of any candidate, or any payment made to promote the success or defeat of a political party or principle, or of any ballot proposal including but not limited to compensation for the personal services of any individual which are rendered in connection with a candidate's election or nomination without charge; provided however, that none of the foregoing shall be deemed a contribution if it is made, taken or performed by a candidate or his spouse or by a person or a political committee independent of the candidate or his agents or authorized political committees.

N.Y. Elec. Law § 14-100(9). Therefore, a payment of money to promote the success or defeat of

4

a candidate is not a "contribution" if the payment is "made, taken or performed . . . by a person or a political committee independent of the candidate or his agents or authorized political committees." *Id.*

### 2. Political Action Committees

Political Action Committees ("PACs") are designated by the Board of Elections as "committee type 2, and cannot make expenditures to aid or take part in the nomination, election or defeat of a candidate, other than in the form of contributions." *See* Dkt. No. 18-27 at ¶ 27 (citing Election Law §§ 14-112, 14-118(1)). According to Defendants, "[t]he reason why committees that only make contributions (PACs) are not required to list candidates being supported or opposed, is that there is no requirement that they comply with candidate limits, as PACs are not authorized committees." *See id.* at ¶ 28 (citing Election Law §§ 14-112, 14-114). Moreover, Defendants claim that PACS do not have to list candidates to be supported or opposed, or to disclose whether they are authorized by candidates or not, because contributions made by PACs are subject to the applicable limit of the recipient candidate or that candidate's authorized committee, and must be disclosed both on the PAC's campaign finance report, as well as the corresponding recipient candidate/committee's report. *See id.* at ¶ 29.

### 3. Authorized/Unauthorized Committees

An "authorized committee" is the term derived from the Election Law relating to those political committees which are specifically authorized by a candidate to "aid or take part in his election." N.Y. Elec. Law §§ 14-112, 14-100(9)(3) & 14-104(1)-(2). An unauthorized

committee is the term derived from the Election Law relating to, as the name implies, committees not authorized by a candidate to "aid or take part in his election." *Id.* This committee is designated as a "Type 9" by the Board of Elections.

Pursuant to the Election Law, "[a]ny political committee aiding or taking part in the election or nomination of any candidate, other than by making contributions, shall file, in the office in which the statements of such committee are to be filed pursuant to this article, either a sworn verified statement by the treasurer of such committee that the candidate has authorized the political committee to aid or take part in his election or that the candidate has not authorized the committee to aid or take part in his election." N.Y. Elec. Law § 14-112. This authorization statement, which is a single page, is referred to as a CF-03 "Committee Authorization Status" form. This provision and the CF-03 form are intended to allow the Board of Elections and the public, including other candidates, to ascertain whether or not a contribution limit applies to that particular committee.

On or about August 17, 2012, Plaintiff FNY filed its CF-03 with the Board of Elections. *See* Dkt. No. 18-30. When asked to list the candidate(s) "for whom your committee is aiding or taking part in their election or nomination (other than by making contributions) but who **have not authorized** your committee to do so," Plaintiff FNY answered "to be determined." *Id.* (emphasis in original).

## B.     Plaintiff HLF

Plaintiff Hispanic Leadership Fund, Inc. ("HLF") is a tax-exempt organization primarily focused on issue advocacy. It is a non-partisan 501(c)(4) social welfare organization

incorporated in Virginia. *See* Dkt. No. 44 at ¶ 6. Plaintiff HLF accomplishes its advocacy

mission through the use of television, radio, and print advertisements. *See id.* at ¶ 13. HLF also

makes contributions to "like-minded organizations[,]" and will occasionally engage in political

speech "expressly advocating for the election or defeat of a candidate, but HLF's major purpose

is issue advocacy." *See id.* at ¶¶ 14-15.

Mario Lopez is the President of Hispanic Leadership Fund. *See* Dkt. No. 89-7 at ¶ 1.

Mr. Lopez claims that he is "'[t]he only person who has a right to determine the content, timing,

or recipient of HLF's contributions." *Id.* (quoting Dkt. No. 60-6 at 15; Dkt. No. 60-3 at 2).[1]

Further, Mr. Lopez contends that "[n]one of HLF's officers or directors have served, belong as

members, or have any relationship with any political committee registered with the New York

State Board of Elections." *Id.* at ¶ 3. Moreover, Plaintiff HLF claims that it only accepts general

---

[1] In their response to Plaintiffs' statement of material facts, Defendants contend that they can "neither admit nor deny whether Mario Lopez is the only person with authority to determine contributions made by Hispanic Leadership Fund, Inc. . . . ." Dkt. No. 110 at ¶¶ 1-2. Defendants respond in this manner to almost every factual assertion contained in Plaintiffs' Rule 7.1 statement.

Throughout this litigation, Defendants have argued that they require additional discovery so that they can determine whether Plaintiffs are actually the types of organizations they claim to be or whether they are actually acting in coordination with candidates or other groups. Defendants arguments on this topic are irrelevant to determining the constitutionality of these provisions. Mr. Lopez has sworn under penalty of perjury that "[n]one of HLF's officers or directors have served, belong as members, or have any relationship with any political committee registered with the New York State Board of Elections[,]" and that "HLF does not accept earmarked contributions and only accepts general contributions." Dkt. No. 89-7 at ¶¶ 3-4. While the information that Defendants seek may be relevant to an enforcement action brought by the Board of Elections for alleged violations of the Election Law, it is entirely unnecessary for the disposition of the present case. The only relevance to the information Defendants seek is to determine whether Plaintiffs have standing to challenge the provisions at issue. As discussed at length in its September 26, 2013 Memorandum-Decision and Order denying Defendants' motion to dismiss for lack of standing and to expedite discovery, the evidence already before the Court clearly establishes Plaintiffs' standing to challenge the statutory provisions at issue. *See* Dkt. No. 78.

contributions, not earmarked contributions. *See id.* at ¶ 4.

Plaintiff HLF claims that it wants to make a contribution to Plaintiff FNY in excess of $5,000 "for the purpose of making independent expenditures '[r]elated to the election of candidates for New York State public office.'" *Id.* at ¶ 8 (citing Dkt. No. 60-6 at 19; Dkt. No. 4-9 at 2). Although it has already contributed $5,000, Plaintiff HLF contends that it has refrained from making contributions in excess of $5,000 to Plaintiff FNY because of New York's contribution limits. *See id.*

C.   **Plaintiff FNY**

Although he was not affiliated with Plaintiff FNY when this lawsuit was first commenced, since approximately September 26, 2013, Dan Backer has served as the Treasurer and sole officer of Plaintiff FNY. *See id.* at ¶ 9; Dkt. No. 110 at ¶ 9. Plaintiff FNY has no members, directors, or employees. *See id.*

Plaintiff FNY is registered with the New York State Board of Elections as a Type 9, independent expenditure only committee. *See id.* at ¶ 10; Dkt. No. 110 at ¶ 10. Plaintiff FNY does not have a separate bank account for purposes of making contributions to candidates or political committees. *See id.* Plaintiff FNY contends that it does not make contributions to candidates and Defendants admit that Plaintiff FNY has not reported making any contributions to candidates. *See id.*

According to Plaintiffs, Mr. Backer serves as treasurer to only one other political committee that is registered with the Board of Elections. *See id.* at ¶ 11. Further, Plaintiffs contend that Mr. Backer is the only person who determines whether Plaintiff FNY makes an

independent expenditure and is the only person who has the right to determine the content, timing, and medium of FNY's independent expenditures. *See id.* at ¶ 12. Additionally, Plaintiffs assert that Mr. Backer has sole discretion over whether to make an independent expenditure in a certain campaign. *See id.*

Plaintiffs contend that Plaintiff FNY only accepts general contributions and does not accept any contributions from foreign nationals. *See id.* at ¶ 15. Finally, Plaintiffs assert that Shaun McCutcheon wishes to contribute more than $150,000 in a calendar year to Plaintiff FNY but that it cannot solicit this money because to do so would violate New York's contribution limits. *See id.* at ¶ 16.

### D.     Plaintiffs' allegations

In their amended complaint, Plaintiffs claim that they wish to meaningfully participate in upcoming elections in New York. Plaintiff HLF wishes to spend more than $5,000 on independent expenditures in New York this year and to make contributions to like-minded organizations. *See* Dkt. No. 44 at ¶¶ 14, 16. Plaintiff HLF alleges that it "has never and does not plan on making any contribution to any candidate for any office. It does, however, wish to make contributions in excess of $5,000 to New York political committees, such as FNY, for the purpose of supporting FNY's independent expenditures." *See id.* at ¶ 17. Moreover, in order to avoid civil and criminal penalties, Plaintiff HLF alleges that it has refrained from making contributions to New York political committees in excess of $5,000. *See id.* at ¶¶ 18-19.

Plaintiff FNY claims that it wishes to solicit and accept corporate contributions in excess of $5,000, and more than $150,000 from individual contributors (as well as donations from

contributors who would exceed the $150,000 aggregate annual limit), for the purpose of expressing its views through independent expenditures. *See id.* at ¶¶ 20-21. Plaintiff FNY claims that, "[d]ue to the restrictions imposed by the Election Law, [it] has refrained from soliciting and accepting contributions for the purpose of expressing its views through independent expenditures in excess of New York statutory limits so as to avoid criminal and civil penalties imposed for violations of Election Law." *See id.* at ¶ 24.

As discussed, New York law prohibits corporations from contributing more than $5,000 in a calendar year to political committees. *See* N.Y. Elec. Law § 14-116(2). Similarly, New York law prohibits individuals from contributing more than $150,000 in a calendar year to political committees. *See* N.Y. Elec. Law § 14-114(8). The New York State Board of Elections has interpreted these statutes to impose these contribution limits against entities that only make independent expenditures. *See* N.Y. Bd. of Elec. 1994 Opinion No. 3 (Apr. 25, 1994). Those individuals and entities who violate these limits are subject to criminal sanctions. *See* N.Y. Elec. Law § 14-126.

In their motion for summary judgment, Plaintiffs contend that New York does not have a sufficiently important governmental interest to restrict contributions to independent expenditure committees because, as courts including the Second Circuit have held, the government's interest in preventing *quid pro quo* corruption is not triggered when individuals or organizations make contributions to groups that engage only in independent spending on political speech. *See* Dkt. No. 106 at 15. "The conclusion that these restrictions are unconstitutional follows inexorably from the decision of the Supreme Court [in] *Citizens United* and the Second Circuit in *New York Progress and Protection PAC*[.]" *Id.*

10

Plaintiffs seek the following declaratory judgments: (1) "That [HLF] is entitled to make unlimited contributions to political committees like FNY for the purpose of expressing its views through independent expenditures;" and (2) "that [FNY] is entitled to solicit and accept unlimited contributions from any source for the purpose of expressing its views through independent expenditures."  Dkt. No. 106 at 7; Dkt. No. 44 at ¶¶ 52-53.

**E.      Subsequent events**

After Plaintiffs filed their motion for summary judgment, several decisions were issued that impact this case, including *McCutcheon v. FEC*, 134 S. Ct. 1434 (2014) and *New York Progress & Protection PAC v. Walsh*, ___ F. Supp. 2d ___, 2014 WL 1641781 (S.D.N.Y. Apr. 24, 2014) ("*NYPPP*").  In *McCutcheon*, as discussed in more detail below, the Supreme Court held that aggregate limits — restrictions on the amount of money a donor may contribute in total to all candidates or committees — "do little, if anything," to further the permissible purpose of combatting *quid pro quo* corruption, "while seriously restricting participation in the democratic process."  *McCutcheon*, 134 S. Ct. at 1442.  In *NYPPP*, Judge Crotty granted the plaintiff's motion for summary judgment and held that the individual contribution limit contained in N.Y. Elec. Law § 14-114(8) as applied to committees that make only independent expenditures violates the First Amendment of the United States Constitution.  *See NYPPP*, 2014 WL 1641781, at *3.  Judge Crotty specifically enjoined the commissioners of the Board of Elections – who are the Defendants in this action – from enforcing N.Y. Elec. Law § 14-114(8) against the plaintiff and its individual donors.  *See id.*

In response to these decisions and Plaintiffs' inquiries, Defendants informed the Court

that they have decided to not appeal the district court's decision in *NYPPP* and that the Board of Elections voted unanimously on May 22, 2014 to not enforce N.Y. Elec. Law § 14-114(8). *See* Dkt. No. 134 at 1. As such, Defendants contend that Plaintiffs' challenge to section 14-114(8) is moot and must be dismissed. *See id.* Defendants, however, indicated that they still intend to enforce section 14-116, and simply argue that *McCutcheon* and *NYPPP* "are not 'equally applicable' to the corporate contribution limit challenged in this case[.]" *Id.* at 2.

In light of Defendants' position regarding Plaintiffs' challenge to section 14-114(8), the Court will first address whether Plaintiffs' challenge is now moot.

### III. DISCUSSION

**A.    Mootness**

"Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies.'" *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013). Accordingly, "'[t]o invoke the jurisdiction of a federal court, a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.'" *Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013) (quotation omitted). "Federal courts may not 'decide questions that cannot affect the rights of litigants in the case before them' or give 'opinion[s] advising what the law would be upon a hypothetical state of facts.'" *Id.* (quotation omitted). "'[I]t is not enough that a dispute was very much alive when suit was filed'; the parties must 'continue to have a "personal stake"' in the ultimate disposition of the lawsuit." *Id.* (quotations omitted).

"There is thus no case or controversy, and a suit becomes moot, 'when the issues

presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Id.* (quotations omitted). But a case "'becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'" *Id.* (quoting *Knox v. Service Employees*, 567 U.S.____, 132 S. Ct. 2277, 2287 (2012)) (other citation omitted). "'As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot.'" *Id.* (quotation omitted).

In *Occupy Columbia v. Haley*, 866 F. Supp. 2d 545 (D.S.C. 2011), the plaintiffs brought suit to enjoin the defendants from interfering with the plaintiffs' twenty-four hour occupation of the State House grounds. *See Occupy Columbia*, 866 F. Supp. 2d at 549. Pursuant to a policy document entitled "Conditions for Use of South Carolina State House and Grounds," no activities were permitted on the grounds beyond 6:00 p.m., "unless special provisions in writing have been made to extend the time." *Id.* at 550. The defendants indicated that they did not plan to enforce the 6:00 p.m. policy against the plaintiffs and then argued that the plaintiffs' challenge was now moot. *See id.* at 562. Finding that the case was not moot and that the plaintiffs established an irreparable injury, the court held that the plaintiffs should not have to rely on representations of officials that they will not enforce a policy against them. *See id.* (citations omitted). Specifically, the court found that the "fear of inconsistent application of policies creates a risk that Plaintiffs will be silenced in violation of the First Amendment." *Id.*

Similarly, in *Occupy Fort Myers v. City of Fort Myers*, 882 F. Supp. 2d 1320 (M.D. Fla. 2011), the plaintiffs challenged several city ordinances on First Amendment grounds. *See id.* at 1330-34. As to one of the ordinances requiring a permit, the City and its Chief of Police asserted that, despite its presence on the books, it was not enforced as to the plaintiffs in this case and

presented two letters in which they informed the plaintiffs that a permit was not required for their planned activities. *See id.* at 1333. Under the facts presented, the district court found that "it would be virtually impossible to find the issues moot." *Id.* Specifically, the district court held that the plaintiffs "are not required to rely upon the City's representations that it will not enforce the ordinance as to them. 'The whim, self restraint, or even the well reasoned judgment of a government official cannot serve as the lone safeguard for First Amendment rights.'" *Id.* (quoting *Florida Cannabis Action Network, Inc. v. City of Jacksonville*, 130 F. Supp. 2d 1358, 1362 (M.D. Fla. 2001)).

Finally, in *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982), the Supreme Court held that "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Id.* at 289. The Court went on to explain that such abandonment is "an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice, but that is a matter relating to the exercise rather than the existence of judicial power." *Id.* In *City of Mesquite*, the Supreme Court found that, even though the city repealed the objectionable language in the ordinance in question, nothing precluded the city from reenacting precisely the same provision if the district court's judgment was vacated. *See id.* ("There is no certainty that a similar course would not be pursued if its most recent amendment were effective to defeat federal jurisdiction"); *see also id.* at 289 n.10 ("'The test for mootness in cases such as this is a stringent one. Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave [t]he defendant . . . free to return to his old ways'") (quotation and other citation omitted).

In the present matter, in a letter dated May 23, 2014, Defendants informed the Court that they were not going to appeal the final judgment in *NYPPP* and that the Board of Elections unanimously voted on May 22, 2014, to not enforce New York Election Law § 14-114(8). *See* Dkt. No. 134 at 1. As such, Defendants argue that Plaintiffs' challenge to section 14-114(8) is now moot.[2]

Contrary to Defendants' position, Plaintiffs' as-applied constitutional challenge of New York Election Law § 14-114(8) is not moot. The New York State legislature has not taken any action to remove the statute or amend it to comply with recent changes in the law. Rather, the Defendant members of the Board of Elections have simply voted to not enforce the provision. Although the Court does not doubt the sincerity of the Board of Elections, finding that Plaintiffs' challenge is now moot would allow Defendants to change their mind and enforce this provision as soon as this action is terminated or when the composition of the Board of Elections changes. *See City of Mesquite*, 455 U.S. at 289 n.10; *Wisconsin Right to Life, Inc. v. Barland*, 751 F.3d 804, 832 (7th Cir. 2014) (finding that the board of elections decision to not enforce the statute at issue against the plaintiff did not render the plaintiff's challenge moot) (citation omitted); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 190 (2000) ("[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of

---

[2] During a May 28, 2014 conference, the parties and the Court discussed the possibility of entering a stipulation of discontinuance regarding Plaintiffs' challenge to N.Y. Elec. Law § 14-114(8). *See* Transcript of Conference dated May 28, 2014, at 7-9. Plaintiffs expressed concern that Defendants could change their mind and decide to enforce this provision and that an independent prosecutor would still have the authority to do the same. *See id.* In light of these concerns, the Court proposed the possibility of issuing a consent order in which the parties would consent to an injunction being entered in which Defendants would be enjoined from enforcing this provision against Plaintiffs. *See id.* An agreement was not reached during the conference and the Court has not heard anything further from either side.

showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur").

Similarly, the decision in *NYPPP* does not render this challenge moot. In that decision, Judge Crotty held that New York Election Laws §§ 14-114(8) and 114-126 were unconstitutional as applied to the plaintiff in that action, and its donors. *See NYPPP*, 2014 WL 1641781, at *3. As such, the court enjoined "Defendants from applying and enforcing New York Election Laws §§ 14–114(8) and 14–126 against NYPPP and its individual donors only for independent expenditures." *Id.* Since *NYPPP* only enjoined the defendants from enforcing section 14-114(8) against the plaintiff in that case and its donors, Defendants are still free to enforce the provision against Plaintiffs in the present matter.

Based on the foregoing, the Court finds that Plaintiffs' challenge to section 14-114(8) is not moot.


## B.     Standard of review

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

C.      **Campaign finance laws and applicable levels of scrutiny**

The United States Supreme Court has held that campaign contribution and expenditure limitations "operate in an area of the most fundamental First Amendment activities." *Buckley*, 424 U.S. at 15. "A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Id.* at 19 (footnote omitted). "This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money." *Id.*

The Supreme Court has drawn a distinct line between limits on contributions and limits on independent expenditures. Contribution limits are "only a marginal restriction upon the contributor's ability to engage in free communication." *Id.* at 20. "A contribution serves as a

general expression of support for the candidate and his views, but does not communicate the underlying basis for the support." *Id.* at 21. "The quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing." *Id.* By contrast, expenditure limits impose "significantly more severe restrictions on protected freedoms of political expression and association." *Id.* at 23. Unlike large campaign contributions, expenditures do "not presently appear to pose dangers of real or apparent corruption." *Id.* at 46; *see also Citizens United*, 558 U.S. at 357 (concluding that "independent expenditures . . . do not give rise to corruption or the appearance of corruption"). "The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate." *Buckley*, 424 U.S. at 47.

As such, expenditure limitations are subject to strict scrutiny – they must "satisfy the exacting scrutiny applicable to limitations on core First Amendment rights of political expression." *Id.* at 44-45. The Supreme Court has repeatedly adhered to *Buckley*'s constraints on expenditure limits. *See Randall v. Sorrell*, 548 U.S. 230, 236 (2006) (citing cases). Contribution limitations, on the other hand, are subject to a less rigorous standard of review – they must be "closely drawn" to match a "sufficiently important interest." *Buckley*, 424 U.S. at 25.[3] In light of this less rigorous standard applicable to contribution limits, the Supreme Court has routinely upheld contribution limits. *See Randall*, 548 U.S. at 247 (citing cases).

---

[3] "Contributions" include expenditures coordinated with a candidate or party, which serve to prevent attempts to circumvent limits placed on contributions. *See Fed. Election Comm'n v. Colo. Republican Fed. Campaign Committee*, 533 U.S. 431, 443 (2001) (citations omitted).

So far, the only constitutionally sufficient justification for campaign finance laws that the Court has recognized is limiting "the actuality and appearance of corruption resulting from large individual financial contributions." *Buckley*, 424 U.S. at 25-26; *see also Davis v. Fed. Election Comm'n*, 554 U.S. 724 (2008). The Court in *Buckley* was concerned with the danger of "large contributions . . . given to secure a political quid pro quo from current and potential office holders." *Buckley*, 424 U.S. at 26-27. The Court acknowledged that "restrictions on direct contributions are preventative, because few if any contributions to candidates will involve *quid pro quo* arrangements." *Citizens United*, 558 U.S. at 357 (citing *Fed. Election Comm'n v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 260, 107 S. Ct. 616, 93 L. Ed. 2d 539 (1986)) (other citations omitted). The Court has also recognized that the government has a valid anticorruption interest in preventing circumvention of contribution limits. *See Fed. Election Comm'n v. Colorado Republican Fed. Campaign Comm.*, 533 U.S. 431, 456 (2001) (*Colorado II* ) ("[A]ll Members of the Court agree that circumvention is a valid theory of corruption").

The standard to apply in these cases was recently made clear by the Supreme Court in *McCutcheon*. Any campaign finance regulation, and any criminal prosecution resulting from the violation thereof, must target activity that results in or has the potential to result in *quid pro quo* corruption. As the Court has explained:

> In a series of cases over the past 40 years, we have spelled out how to draw the constitutional line between the permissible goal of avoiding corruption in the political process and the impermissible desire simply to limit political speech. We have said that government regulation may not target the general gratitude a candidate may feel toward those who support him or his allies, or the political access such support may afford. "Ingratiation and access . . . are not corruption." They embody a central feature of democracy — that constituents support candidates who share their beliefs and interests, and candidates who are elected can be

expected to be responsive to those concerns.

> Any regulation must target instead what we have called "*quid pro quo*" corruption or its appearance. That Latin phrase captures the notion of a direct exchange or an official act for money. "The hallmark of corruption is the financial quid pro quo: dollars for political favors." Campaign finance restrictions that pursue other objectives, we have explained, impermissibly inject the Government "into the debate over who should govern." And those who govern should be the last people to help decide who should govern.

*McCutcheon*, 134 S. Ct. at 1441–42 (emphases in original) (internal citations omitted). In short, combating *quid pro quo* corruption, or the appearance thereof, is the only interest sufficient to justify campaign-finance restrictions. "Over time, various other justifications for restricting political speech have been offered — equalization of viewpoints, combating distortion, leveling electoral opportunity, encouraging the use of public financing, and reducing the appearance of favoritism and undue political access or influence — but the Court has repudiated them all." *Wisconsin Right to Life, Inc. v. Barland*, 664 F.3d 139, 153-54 (7th Cir. 2014) (collecting cases). The First Amendment "prohibits such legislative attempts to 'fine-tune' the electoral process, no matter how well intentioned." *McCutcheon*, 134 S. Ct. at 1450.

**D.     Relevant case law**

   *1. Buckley v. Valeo***, 424 U.S. 1 (1976)**

   In *Buckley*, the Supreme Court upheld contribution limits to candidates but struck down limits on expenditures. One of the contribution limits the Court upheld was the $25,000 aggregate limit on contributions to candidates and political committees. *See Buckley*, 424 U.S. at 38. But the Court was not addressing contributions to political committees for independent

expenditures, only contributions to "political committees likely to contribute to [a particular] candidate." *Id.* The concern was that the absence of an aggregate cap would facilitate "evasion of the $1,000 contribution limitation." *Id.* In other words, a donor could make numerous contributions to different PACs likely to make contributions to the favored candidate and thereby evade the individual limits on contributions to candidates. The aggregate limitation served a justifiable limit on a donor's ability to contribute dollars directly to a candidate, either personally or through a PAC.[4]

### 2. California Med. Ass'n v. Federal Election Comm'n, 453 U.S. 182 (1981) ("Cal-Med")

Similarly, in *Cal–Med*, the Supreme Court reaffirmed contribution limits to multi-candidate political committees, *i.e.*, PACs that made campaign contributions to multiple candidates. *See Cal-Med*, 453 U.S. at 197-99. The Court reasoned, as in *Buckley*, that Congress could restrict contributions to such committees or else individuals could circumvent the $1,000 limit on individual contributions and the $25,000 aggregate limit. *See id.* In the opinion, however, there was no discussion, let alone approval, of contribution restrictions for independent expenditures. In fact, Justice Blackmun, in his concurring (and controlling) opinion, underscored that "a different result would follow if [the restrictions] were applied to contributions to a political committee established for the purpose of making independent expenditures, rather than contributions to candidates." *Id.* at 203 (Blackmun, J., concurring) (emphasis added).

---

[4] As discussed below, the aggregate limitation was found to be unconstitutional in *McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434 (2014).

### *3. Citizens United v. Federal Election Comm'n*, 558 U.S. 310 (2010)

Before launching into a claim-by-claim analysis, it is worthwhile to set forth the holdings and central reasoning in *Citizens United v. Federal Election Comm'n*. In *Citizens United*, the Supreme Court produced a two-fold ruling: "Government may regulate corporate political speech through identification and disclosure requirements, but it may not suppress that speech altogether." *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 319 (2010).

In *Citizens United*, the Supreme Court made clear that there is no state interest sufficient to justify a law that entirely prohibits corporate and union independent political expenditures. It reasoned that the only valid governmental interest in regulating campaign expenditures is preventing the reality or appearance of *quid-pro-quo* corruption, and independent expenditures, precisely because they are uncoordinated with candidates, pose no such threat. *See id.* at 357-58. This view on campaign spending is at least as old as *Buckley v. Valeo*, in which the Supreme Court remarked that "[u]nlike contributions, such independent expenditures may well provide little assistance to the candidate's campaign and indeed may prove counterproductive." *Buckley v. Valeo*, 424 U.S. 1, 47 (1976).

*Citizens United* also held that the "First Amendment does not permit Congress to make these categorical distinctions based on the corporate identity of the speaker and the content of the political speech." *Citizens United*, 558 U.S. at 365. The Court accordingly struck down 2 U.S.C. § 441b's total ban on corporate and union spending from general treasury funds for express advocacy or electioneering communications – forms of regulated independent expenditures. *See id.* at 365-66.[5] In *Citizens United*, the Supreme Court overruled *Austin v.*

---

[5] Express advocacy refers to communications that direct the viewer in the manner of words

(continued...)

*Michigan Chamber of Commerce*, 494 U.S. 652 (1990), and, in part, *McConnell v. Federal Election Comm'n*, 540 U.S. 93, 203-09 (2003), which had permitted limits on such corporate speech.

In reaching that result, *Citizens United* dispatched the counter-argument that the law's provision allowing a corporation that wished to engage in such speech to form a PAC was a suitable alternative to direct corporate or union speech. *See Citizens United*, 558 U.S. at 337-38. Previously, a corporation like the plaintiff in *Citizens United* could only engage in express advocacy or electioneering speech indirectly by creating a PAC, to which only its stockholders or employees could contribute. *See id.* at 320-21. The Court found that the PAC approach did not alleviate the electioneering ban's speech-repressive effects, because such PACs did not allow the corporation or union to speak for itself and were subject to extensive registration, reporting, and disclosure requirements. *See id.* at 338-39. Thus, federal PACs were "burdensome alternatives," and posed "onerous restrictions" that could hinder corporate and union speech during a campaign. *See id.* That critique reflected a longstanding skepticism of a federally-defined PACs' ability to substitute for pure political speech. *See Fed. Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 477 n.9 (2007); *Mass. Citizens for Life, Inc.*, 479 U.S. at 253-56.

---

[5](...continued)
like "'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.'" *Buckley*, 424 U.S. at 44 n.52; *see also Fed. Election Comm'n v. Mass. Citizens for Life, Inc. ( MCFL)*, 479 U.S. 238, 249-50 (1986). Under federal law, an electioneering communication is "any broadcast, cable, or satellite communication" that "refers to a clearly identified candidate for Federal office" and that is made within sixty days before a general election and thirty days before a primary election. 2 U.S.C. § 434(f)(3)(A)(i).

At the same time, eight justices joined the portion of the *Citizens United* opinion upholding the identification and disclosure requirements that also applied to the plaintiff. *See Citizens United*, 558 U.S. at 318, 365-71. This part of the opinion affirmed another longstanding view: in spite of the burdens they pose to political speech, "disclosure requirements certainly in most applications appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption that Congress found to exist." *Buckley*, 424 U.S. at 68. Since *Buckley*, the Supreme Court has recognized that different legitimate government interests support disclosure requirements, as opposed to those interests which support limits on spending in campaigns. These interests include (1) informing voters as to the "sources of a candidate's financial support," enabling voters to better "evaluat[e] those who seek office"; (2) limiting corruption and its appearance by making large contributions and expenditures transparent; and (3) gathering data to discover any violations of the campaign finance laws. *Id.* at 66-68.

The Supreme Court relied on the first rationale to justify the provisions applied to the plaintiff in *Citizens United*. *See Citizens United*, 558 U.S. at 367-71. To gauge their constitutionality, it applied *Buckley*'s "'exacting scrutiny'" test, which requires a "'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." *Id.* at 366-67 (citing *Buckley*, 424 U.S. at 64, 66); *see also John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010) (confirming that the exacting scrutiny standard applies to disclosure requirements) (citations omitted). The provisions at issue survived this scrutiny. *See id.* at 369-70.

In reaching its conclusion, the Supreme Court in *Citizens United* explicitly rejected the argument that disclosure could only cover express advocacy or its functional equivalent. *See id.*

at 368-69.  This statement assured the vitality of the part of *McConnell* in which the Court "rejected the notion that the First Amendment requires Congress to treat so-called issue advocacy differently from express advocacy."  *McConnell*, 540 U.S. at 194; *see also Citizens United*, 558 U.S. at 368-69.  The *Citizens United* Court made clear that the power to require disclosure extends beyond the power to limit speech, analogizing that although Congress "has no power to ban lobbying itself," it may require registration and disclosure of lobbyists.  *See Citizens United*, 558 U.S. at 369 (citing *United States v. Harriss*, 347 U.S. 612, 625, 74 S. Ct. 808, 98 L. Ed. 989 (1954)).  Indeed, *Citizens United* went further toward solidifying this principle, explicitly endorsing a system of relatively unrestricted political speech paired with "effective disclosure," noting that many of Congress' findings of influence-peddling in promulgating campaign finance legislation "were premised on a system without adequate disclosure."  *Id.* at 370 (citations omitted).

### 4. *McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434 (2014)

"[T]he First Amendment safeguards an individual's right to participate in the public debate through political expression and political association," and "[w]hen an individual contributes money to a candidate, he exercises both of those rights."  *McCutcheon*, 134 S. Ct. at 1448.  According to the Supreme Court, in order to be valid, any regulation of campaign contributions must target "'*quid pro quo*' corruption or its appearance," that is, the "direct exchange of an official act for money," or "dollars for political favors."  *Id.* at 1441; *see also id.* at 1450 ("In addition to 'actual *quid pro quo* arrangements,' Congress may permissibly limit 'the appearance of corruption stemming from public awareness of the opportunities for abuse

inherent in a regime of large individual financial contributions' to particular candidates'").  The Government may not impose campaign finance restrictions that pursue other objectives.  *See id.* at 1441 ("Campaign finance restrictions that pursue other objectives . . . impermissibly inject the Government 'into the debate over who should govern'"); *see also Citizens United*, 558 U.S. at 359 ("When *Buckley* [*v. Valeo*, 424 U.S. 1, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976)] identified a sufficiently important governmental interest in preventing corruption or the appearance of corruption, that interest was limited to *quid pro quo* corruption").

In *McCutcheon*, the Supreme Court held that aggregate limits — restrictions on the amount of money a donor may contribute in total to all candidates or committees — "do little, if anything," to further the permissible purpose of combatting *quid pro quo* corruption, "while seriously restricting participation in the democratic process." *McCutcheon*, 134 S. Ct. at 1442. Specifically, the Supreme Court stated:

> Spending large sums of money in connection with elections, but not in connection with an effort to control the exercise of an officeholder's official duties, does not give rise to such *quid pro quo* corruption.  Nor does the possibility that an individual who spends large sums may garner "influence over or access to" elected officials or political parties.

*Id.* at 1450–51 (quotation and other citation omittted); *see also id.* at 1441 ("[G]overnment regulation may not target the general gratitude a candidate may feel toward those who support him or his allies, or the political access such support may afford.  'Ingratiation and access are not corruption'") (quoting *Citizens United*, 558 U.S. at 360, 130 S. Ct. 876).  The Supreme Court therefore concluded that the aggregate limits of 2 U.S.C. § 441a(a)(3) were invalid under the First Amendment.  *See McCutcheon*, 134 S. Ct. at 1442.

### 5. *SpeechNow.org v. Federal Election Comm'n*, 599 F.3d 686 (D.C. Cir. 2010) (en banc)

In the first decision analyzing contribution limitations following *Citizens United*, the D.C. Circuit found unconstitutional the Bipartisan Campaign Reform Act's contribution limits as applied to an independent expenditure-only group. *See SpeechNow.org v. Federal Election Comm'n*, 599 F.3d 686 (D.C. Cir. 2010) (en banc). Recognizing the government's anti-corruption interest as the only legitimate basis for limiting contributions, the D.C. Circuit reasoned that "because *Citizens United* holds that independent expenditures do not corrupt or give the appearance of corruption as a matter of law, then the government can have no anti-corruption interest in limiting contributions to independent expenditure-only organizations." *Id.* at 696. The court rejected the argument that independent expenditures "lead to preferential access for donors and undue influence over officeholders," because, following *Citizens United*, "ingratiation and access . . . are not corruption." *Id.* at 694 (alteration omitted). In response, the FEC argued that *Citizens United* did not unsettle *Buckley*'s decision upholding contribution limits. *Buckley*, however, concerned only direct contributions to candidates. The court reasoned that, although limits on direct contributions to candidates may prevent *quid pro quo* corruption, limits on contributions for the purpose of making independent expenditures promote no anti-corruption interest. *See id.*

### E.    Application

### 1. N.Y. Elec. Law § 14-114(8) – Individual Contribution Limits

As discussed, an individual may make contributions, loans, or guarantees of funds of up to $150,000 in any year "in connection with the nomination or election of persons to state and

local public offices and party positions within the state of New York in any one calendar year."

N.Y. Elec. Law § 14-114.  In an opinion issued by the New York State Board of Elections, this

$150,000 limit applies to "contributions to independent committees[.]"  *See* Dkt. No. 4-7 at 3.

Plaintiffs contend that, in light of *Citizens United* and its progeny, New York is without a

sufficiently important government interest to restrict contributions to independent expenditure

committees because, as the courts have uniformly held, the government's interest in preventing

*quid pro quo* corruption is not triggered when individuals or organizations make contributions to

groups that engage only in independent spending on political speech.  *See* Dkt. No. 106 at 15.

Although Defendants have now indicated that the Board of Elections will no longer

enforce this provision in light of the decision in *NYPPP*, they initially argued in support of

section 14-114(8)'s constitutionality.  *See* Dkt. No. 109 at 19-35.  Specifically, Defendants first

argued that "contribution limits impose only marginal restriction on speech and are reviewed

deferentially."  *Id.* at 19-20.  Thereafter, Defendants discussed at length the fact that "Super

PACs" pose a substantial risk of corruption and create the appearance of corruption.  *See id.* at

21-29.  Next, Defendants contend that the Supreme Court has upheld limits on contributions to

committees.  *See id.* at 33-34 (citing *McConnell*, 540 U.S. at 133-154 (upholding limits on

contributions to party committees); *Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 201 (1981)

(upholding limit on contributions to multicandidate committees); *Buckley*, 424 U.S. at 38

(upholding aggregate limit on contributions to "political committees")) (other citations omitted).

Finally, Defendants argue that the decisions of other circuits are either wrongly decided or

inapposite to the present matter.  *See id.* at 34-36.

As previously discussed, in *New York Progress & Protection PAC v. Walsh*, ___ F. Supp.

2d ___, 2014 WL 1641781 (S.D.N.Y. Apr. 24, 2014) ("*NYPPP*"), Judge Crotty granted the plaintiff's motion for summary judgment and held that the individual contribution limit contained in N.Y. Elec. Law § 14-114(8) as applied to committees that make only independent expenditures violates the First Amendment of the United States Constitution. *See id.* at *3. The defendants had claimed that unlimited contributions to independent expenditure-only PACs create the risk of corruption. *See id.* at *2. According to the defendants, "'many political committees are so closely affiliated with candidates — including being operated by the candidate's close friends, former employees, and other allies — that they function in effect as extensions of candidates' own operations.'" *Id.* The court disagreed and found that "these tenuous connections hardly rise to the level of coordination – and certainly not to the level of *quid pro quo* corruption articulated by *Citizens United* and *McCutcheon*." *Id.* Rather, the court found that the tenuous relationships to which the defendants pointed "are inherent in politics and in any political campaign." *Id.* Once it was determined that the plaintiff was an independent expenditure-only organization, there was "little left for the Court to do." *Id.* at *3. Judge Crotty specifically enjoined the commissioners of the Board of Elections – who are the Defendants in this action – from enforcing N.Y. Elec. Law § 14-114(8) against the plaintiff and its individual donors. *See id.*

As in *NYPPP*, the Court finds that the tenuous connections Plaintiffs may have to individuals associated with politicians hardly rise to the level of coordination or *quid pro quo* corruption articulated in *Citizens United* and *McCutcheon*. Remanding *NYPPP* back to the district court, the Second Circuit clearly held that "preventing *quid pro quo* corruption is the only government interest strong enough to justify restrictions on political speech, and the threat of

quid pro quo corruption does not arise when individuals make contributions to groups that engage in independent spending on political speech." *New York Progress and Protection PAC v. Walsh*, 733 F.3d 483, 487 n.1 (2d Cir. 2013). Furthermore, in *McCutcheon*, the Supreme Court noted that the "base and aggregate limits govern contribution to traditional PACs, but not to independent expenditure PACs." *McCutcheon*, 134 S. Ct. at 1442 n.2. In making this distinction, the Court cited favorably to *SpeechNow.org*, where an en banc panel of the D.C. Circuit unanimously held that the government has no anticorruption interest in limiting contributions to an independent expenditure group. *See SpeechNow.org*, 599 F.3d at 695-96.

Regardless of whether the Court agrees with the Supreme Court's interpretation of the First Amendment in the context of this case, having thoroughly reviewed the parties' submissions regarding the pending motions, as well as the relevant law, the Court must conclude that the contribution limit set forth in New York Election Law § 14-114(8), as applied to independent expenditure-only organizations, cannot prevent *quid pro quo* corruption or its appearance. As such, the Court finds that N.Y. Elec. Law § 14-114(8) is unconstitutional as applied to Plaintiffs; and, therefore, the Court enjoins Defendants from enforcing N.Y. Elec. Law § 14-114(8) against Plaintiffs and their individual donors.

### 2. N.Y. Elec. Law § 14-116(2) – Corporate Contribution Limits

As discussed, a corporation doing business in New York may make contributions up to $5,000 in any year for purposes related to elections for New York state, local office, or party positions. *See* N.Y. Elec. Law § 14-116(2). As with the aggregate limits placed on individual donors, Defendants have taken the position that this provision applies to corporations who wish

to make contributions to independent expenditure-only organizations in excess of the $5,000 limit.

Defendants argue that "corporate contributions are treated differently from individual contributions. *NYPPP* and *McCutcheon* dealt solely with individual contributions; as a result, those decisions are not 'equally applicable' to the corporate contribution limit challenged in this case, as plaintiffs contend." Dkt. No. 134 at 2. Defendants further argue that "[r]ecent Supreme Court case law has upheld limitations on corporate contributions that would not be valid if applied to individual contributions. In *FEC v. Beaumont*, the Supreme Court upheld a *total ban* on corporate contributions to political candidates." *Id.* (other citations omitted). Similarly, in *Beaumont*, which Defendants maintain still controls on the issue of corporate contribution limits, "the Court upheld the federal ban on corporate contributions even as applied to a non-profit corporation entitled to make unlimited expenditures for express advocacy." *Id.* (citing *Beaumont*, 539 U.S. at 159-62 (citing *FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238 (1986))). Defendants also contend that *Beaumont* recognized that a plaintiff's First Amendment speech interest in giving and receiving corporate contributions is "much slighter than an individual's interest in making contributions." *Id.* Defendants assert that, under *NYPPP*, the individual members of corporate Plaintiff HLF have an easily available alternative to making donations: "they are now free to make unlimited contributions *directly* to independent expenditure-only committees." *Id.* (emphasis in original).

Defendants argue that the State has two important interests that outweigh Plaintiff HLF's limited First Amendment speech interest in making corporate contributions. *See id.* at 3. "First, the State has a compelling interest in deterring corruption and the appearance of corruption." *Id.*

"Second, the State has an important interest in preventing circumvention of its disclosure laws. New York law requires a political committee to report the names of its contributors. . . If corporations could make unlimited contributions, then individual donors could very easily use corporations bearing 'dubious and misleading names' as vehicles for enormous anonymous spending to influence the outcome of democratic elections." *Id.* (quoting *McConnell v. FEC*, 540 U.S. 93, 197 (2003)).

Plaintiffs, however, contend that Defendants want "this Court to take the constitutionally untenable position that once individuals have joined together in an incorporated form, they lose the right to do what they could otherwise do in their individual capacities – namely make contributions to entities that engage solely in independent expenditures." Dkt. No. 135 at 2. Plaintiffs contend that this position is directly contrary to the Supreme Court's holding in *Citizens United*. *See id.* Further, Plaintiffs claim that, contrary to Defendants assertions, other courts have clearly recognized that corporate contributions to independent expenditure only committees cannot constitutionally be limited." *Id.* (citations omitted). Finally, Plaintiffs contend that Defendants "continue[ ] to seek refuge in a distinction that the courts have not recognized. The Attorney General conflates contribution limits as applied to contributions to candidates, with what HLF and FNY are challenging here, namely, contribution limits as applied to contributions to entities who only make independent expenditures." *Id.*

In the present matter, having reviewed the parties positions and the applicable law, the Court finds that N.Y. Elec. Law § 14-116(2) is unconstitutional as applied to Plaintiffs. Defendants reliance on *Beaumont* and other similar cases discussing corporate contributions is misplaced.

In *Beaumont*, the United States Supreme Court held that governments may constitutionally ban corporate contributions. The Supreme Court observed that such bans, among other things, "'preven[t] corruption or the appearance of corruption.'" *Beaumont*, 539 U.S. at 154 (quoting *FEC v. Natl. Conservative Political Action Comm.*, 470 U.S. 480, 496–97, 105 S. Ct. 1459, 84 L. Ed. 2d 455 (1985)). Moreover, unlike bans on independent expenditures, "bans on political contributions have been treated as merely 'marginal' speech restrictions subject to relatively complaisant review under the First Amendment, because contributions lie closer to the edges than to the core of political expression." *Id.* at 161 (quoting *FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 440, 121 S. Ct. 2351, 150 L. Ed. 2d 461 (2001)).

As Plaintiffs correctly contend, *Beaumont* dealt with a ban on corporate contributions to candidates rather than contributions to independent expenditure-only committees. As such, it was the type of speech at issue in *Beaumont*, *i.e.*, political contributions by the corporation to a candidate, rather than the corporate identity of the corporate plaintiff that led to the result reached by the Supreme Court. Defendants argu that Plaintiff HLF's corporate identity renders the limit on corporate contributions to independent expenditure-only committees constitutional. This position, however, is clearly untenable with the applicable Supreme Court caselaw. In *Citizens United*, the Court held that "[t]he First Amendment does not permit Congress to make these categorical distinctions based on the corporate identity of the speaker and the content of the political speech. . . We return to the principle established in *Buckley* and *Bellotti* that the Government may not suppress political speech on the basis of the speaker's corporate identity. No sufficient governmental interest justifies limits on political speech of nonprofit or for-profit corporations." *Citizens United*, 558 U.S. at 364-65.

In *Citizens United*, the Supreme Court declared that "'[t]he absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate.'" *Citizens United*, 558 U.S. at 345 (quoting *Buckley*, 424 U.S. at 47). As such, several Courts of Appeals, including the Second Circuit, have concluded that an anti-corruption rationale cannot apply to contributions to groups that engage only in independent expenditures. *See Vermont Right to Life Comm. v. Sorrell*, ___ F.3d ___, 2014 WL 2958565, *18 (2d Cir. 2014) (citing cases).

In *Wisconsin Right to Life, Inc. v. Barland*, 751 F.3d 804 (7th Cir. 2014), the plaintiff challenged Wisconsin's statute capping the amount at $20,000 that a corporation may spend to solicit contributions to its affiliated PAC. *See id.* at 831. The defendants conceded that the ban was unconstitutional and the Seventh Circuit agreed, holding that the "statute is plainly unconstitutional under the rationale of *Citizens United* and our decision in *Barland I*[.]" *Id.* at 831-32.

In *Texans for Free Enterprise v. Texas Ethics Comm'n*, 732 F.3d 535 (5th Cir. 2013), the plaintiff was a "'direct campaign expenditure only committee,' meaning that it does not make any contributions to candidates or their official committees. Rather, it spends funds only to support its own speech in favor of or against candidates." *Id.* at 536. The plaintiffs challenged a portion of the Texas law that prohibited corporations from spending or receiving money to engage in political speech independent of any candidate for office. *See id.* Finding the plaintiff was likely to succeed on the merits of its case, the court enjoined the provisions' enforcement and held as follows:

We tread a well-worn path. The Seventh, Ninth, and District of Columbia Circuits have considered and held unconstitutional bans or limits on corporate contributions to independent political committees. Indeed, every federal court that has considered the implications of *Citizens United* on independent groups like TFE has been in agreement: There is no difference in principle — at least where the only asserted state interest is in preventing apparent or actual corruption — between banning an organization such as TFE from engaging in advocacy and banning it from seeking funds to engage in that advocacy (or in giving funds to other organizations to allow them to engage in advocacy on its behalf).

*Id.* at 537-38 (internal footnotes omitted).

In *General Majority PAC v. Aichele*, No. 1:14-cv-332, 2014 WL 3955079 (M.D. Pa. Aug. 13, 2014), the plaintiff challenged a provision of Pennsylvania's Election Code which prohibited corporations and unincorporated associations from contributing to independent expenditure-only groups. *See id.* at *4 (citation omitted). These groups were similarly prohibited from accepting such contributions. *See id.* Finding that the law at issue was unconstitutional, the court noted that it was joining "host of federal courts, including the Courts of Appeal[ ] for the Second, Fifth, Seventh, Ninth, Tenth, and D.C. Circuits," in finding "statutory limitations on independent expenditures unconstitutional following *Citizens United*." *Id.* at *4-*5 (citing *N.Y. Progress & Prot. PAC*, 733 F.3d at 487; *Texans for Free Enter.*, 732 F.3d at 538; *Wis. Right to Life State PAC*, 664 F.3d at 143; *Long Beach Area Chamber of Commerce*, 603 F.3d at 698–99; *Republican Party*, 741 F.3d at 1095–96; *SpeechNow.org*, 599 F.3d at 696).

A review of this authority makes clear that N.Y. Elec. Law § 14-116(2) is unconstitutional as applied to Plaintiff HLF. As the Second Circuit noted, "[f]ew contested legal questions are answered so consistently by so many courts and judges." *NYPPP*, 733 F.3d at 488.

This result obtains regardless of the standard of review. *See id.* at 487 n.1. After *Buckley*, political contribution limits are subject to heightened scrutiny, which requires that they be "closely drawn" to match a "sufficiently important interest." *Buckley*, 424 U.S. at 25. Expenditure limits, however, are subject to even higher scrutiny, requiring that they be narrowly tailored to meet a compelling government interest. *See Citizens United*, 558 U.S. at 340. In this case, the effect of the restrictions is to limit contributions that can be made to a committee that seeks to make independent expenditures. Only one such interest has ever been recognized to justify such limits: preventing corruption or the appearance of corruption. *See SpeechNow.org*, 599 F.3d at 695-96. Since *Citizens United* held "as a matter of law that independent expenditures do not corrupt or create the appearance of *quid pro quo* corruption," it followed inexorably that "contributions to groups that make only independent expenditures also cannot corrupt or create the appearance of corruption." *Id.* at 694. And since "[t]he First Amendment does not permit . . . categorical distinctions based on the corporate identity of the speaker and the content of the political speech[,]" it inevitably follows that New York Election Law § 14-116(2) is unconstitutional as applied in the present matter. *See Citizens United*, 558 U.S. at 364.

Based on the foregoing, the Court finds that N.Y. Elec. Law § 14-116(2) is unconstitutional as applied to Plaintiff HLF. As such, the Court enjoins Defendants from enforcing N.Y. Elec. Law § 14-116(2) against Plaintiffs.


**D.      Defendants' argument that summary judgment is premature**

Defendants argue that they need additional discovery because they cannot determine whether Plaintiff FNY is in fact an independent-expenditure only committee, as it claims to be.

The Court disagrees. First, the Supreme Court has repeatedly admonished against extensive discovery in election law cases. *See Fed. Elec. Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 469 (2007). Further, most of the information that Defendants seek is entirely irrelevant to the present matter. As Plaintiffs' correctly contend, much of the information Defendants seek is more appropriately sought in an enforcement action if a complaint is ever lodged against Plaintiffs alleging that they violated some aspect of the Election Law.

In *SpeechNow.org v. Fed. Election Comm'n*, 599 F.3d 686 (D.C. Cir. 2010), the plaintiff was an unincorporated nonprofit association registered as a "political organization" under the Internal Revenue Code. *See id.* at 689. Its stated purpose was to "promote the First Amendment rights of free speech and freedom to assemble by expressly advocating for federal candidates whom it views as supporting those rights and against those whom it sees as insufficiently committed to those rights." *Id.* Although it had not yet begun operations, it planned to acquire funds solely through donations by individuals and intended to operate "exclusively through 'independent expenditures.'" *Id.* Despite the fact that the plaintiff had not yet begun its operations, the court held that "[t]he contribution limits of 2 U.S.C. § 441a(a)(1)(C) and 441a(a)(3) violate the First Amendment by preventing plaintiffs from donating to SpeechNow in excess of the limits and by prohibiting SpeechNow from accepting donations in excess of the limits." *Id.* at 696. The court made clear, however, their decision only "applied to contributions to SpeechNow, an independent expenditure-only group." *Id.*

As discussed, Defendants argument regarding the need for additional discovery misses the point. Addressing an argument raised that the court should not find the statute at issue unconstitutional as applied because their was evidence of coordination between the two

plaintiffs, the Tenth Circuit held that "the logic of *Citizens United* would insist on the enforcement of bans on coordination, rather than targeting an entire class of contributions to independent groups." *Republican Party of New Mexico v. King*, 741 F.3d 1089, 1096 n.4 (10th Cir. 2013). The court continued as follows:

> *Citizens United* did not treat corruption as a fact question to be resolved on a case-by-case basis. Instead, the Court considered whether independent speech is the type that poses a risk of quid pro quo corruption or the appearance thereof. *See Citizens United*, 558 U.S. at 360, 130 S. Ct. 876. The Court determined that speech through independent expenditures does not pose such a risk. But it did not question the government's authority to enforce restrictions against coordination between candidates and independent expenditure PACs — coordination breaks the essential independence of the expenditure and has always been deemed the functional equivalent of a candidate contribution.

*Id.*

Both Plaintiffs are relatively new entities in New York, who have refrained from engaging in the protected activities at issue because of the threat of prosecution. Additional discovery would only serve to prolong the Court in reaching this inevitable result. *See id.*; *see also Personal PAC v. McGuffage*, 858 F. Supp. 2d 963, 968 (N.D. Ill. 2012) (citation omitted).

Based on the foregoing, the Court denies Defendants' request that the Court deny Plaintiffs' motion for summary judgment as premature.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiffs' motion for summary judgment is **GRANTED**; and the Court

further

**ORDERS** that N.Y. Elec. Law §§ 14-114(8) and 14-116(2) are unconstitutional as applied to Plaintiffs; and the Court further

**ORDERS** that Defendants are enjoined from enforcing N.Y. Elec. Law §§ 14-114(8) and 14-116(2) against Plaintiffs and their individual donors, as set forth in this Court's July 2, 2014 Order; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: August 28, 2014
      Albany, New York

Mae A. D'Agostino
U.S. District Judge